**Elias SPARKS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–437.**

District of Columbia Court of Appeals.

Argued April 11, 2000.

Decided May 11, 2000.

Ronald Bonsib for appellant.

Amul Thapar, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman and Angela Schmidt, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

After a jury trial, appellant Elias Sparks was convicted of aggravated assault while armed, in violation of D.C.Code §§ 22–504.1, –3202 (1996), and possession of a firearm during the commission of a crime of violence ("PFCV"), in violation of § 22–3204(b).[1] Sparks filed a notice of appeal contending, *inter alia,* that the trial court erred in permitting introduction of: (1) the victim's prior identification statements, as substantive evidence; and (2) details, through the testimony of police officers, about the victim's prior inconsistent statements, as impeachment evidence. The government maintains that the victim's prior identification statements were properly admitted as substantive evidence under D.C.Code § 14–102 (Supp.2000), and that the trial court did not abuse its discretion in allowing the government to impeach the victim by introducing, through law enforcement officers, details about the prior identification. We affirm.

## FACTUAL SUMMARY

The record on appeal shows the following facts. John Garner, the victim of the armed aggravated assault, and Sparks were lifelong friends who lived two houses from each other in the 1100 block of First

---

1. Sparks was sentenced to three to nine years in prison on the aggravated assault while armed charge and was given a five to fifteen year consecutive prison term on the PFCV offense.

Place, N.W., Washington, D.C., for at least twenty years. According to evidence presented by the government at trial, Sparks and his three brothers, and Mr. Garner and his sister, grew up together in the First Place neighborhood. At the time of the incident which resulted in Sparks' prosecution, Mr. Garner resided with his sister, Michelle Garner, at the First Place home.

Around 10:00 p.m. on December 26, 1996, Sparks knocked on the door of the Garner home and asked Ms. Garner whether her brother was home. She replied, "yes," and told Sparks he could go upstairs to the third floor where Mr. Garner was located. Later, Ms. Garner saw Sparks leave the house followed, about ten to fifteen minutes later, by Mr. Garner. Still later, Ms. Garner heard one gunshot outside, but did not find it unusual in that neighborhood. About fifteen or twenty minutes after her brother left the house, someone knocked at the door; Ms. Garner went outside and saw her brother on the ground bleeding.

Shortly after 10:00 p.m. that same evening, Officer Aida Rodriguez of the Metropolitan Police Department ("MPD") was assigned to investigate an assault in progress in the 1100 block of First Place, N.W. Upon arrival, she saw a man, later identified as Mr. Garner, "bleeding really bad and . . . laying on the ground holding his head." Although Mr. Garner did not want to talk at the scene of the incident, he spoke with Officer Rodriguez at the hospital where he was transported. Mr. Garner was "coherent" and "calm." When the prosecutor asked Officer Rodriguez what information Mr. Garner gave her "about who assaulted him," she asserted: "He described two Black males. They were brothers. He described them as five foot six, both of them, medium complected, both curly hair. And he also gave me their addresses and their names." The names Mr. Garner gave to the officer were: Elias and Jesse Sparks. Mr. Garner also "described two Cadillacs" that

belonged to Elias and Jesse Sparks; both were dark-colored. After completing her interview with Mr. Garner, Officer Rodriguez returned to the crime scene. There she saw two dark-colored Cadillacs. After running checks on the cars, she determined that both Cadillacs were registered to Elias Sparks.

Sergeant Gerald Neill, Jr. of the MPD also spoke with Mr. Garner at the hospital on the evening of his assault. He portrayed Mr. Garner as "a little upset but he was calm and his voice was steady." Sergeant Neill asked Mr. Garner what had happened. "Mr. Garner stated he was in his sister's house when Elias Sparks called him outside and he went outside and Elias Sparks was outside. [Elias] and Jesse beat him with guns and as they were beating him, one gun discharged. And then they ran." The bullet did not hit Mr. Garner. Sergeant Neill ascertained that Mr. Garner grew up with Elias and Jesse Sparks, and that Mr. Garner was certain that both brothers had hit him with guns. Mr. Garner told Sergeant Neill: "I saw both of them strike me with guns." Further, Mr. Garner "said he could see [Elias and Jesse Sparks]."

Several days after the December 26, 1996, assault of Mr. Garner, Detective Michael Fulton of the MPD was assigned to the investigation. He had an initial telephone interview with Mr. Garner during which Mr. Garner confirmed that Elias and Jesse Sparks had assaulted him. On January 2, 1997, Detective Fulton met with Mr. Garner and asked questions about the assault. Mr. Garner acknowledged that "Jesse Sparks had asked [him] why are you spreading rumors on us?" After the interview, Detective Fulton separately showed Mr. Garner photos of Elias and Jesse Sparks and Mr. Garner identified both as his assailants. During the month before Sparks' trial, Detective Fulton spoke with Mr. Garner "at least three different times" and he never indicated uncertainty about his identification of Elias and Jesse Sparks. However, Detective

Fulton also asserted that Mr. Garner was reluctant to proceed with the case against Elias and Jesse Sparks.

Despite his statements to law enforcement officers after his assault that implicated Elias and Jesse Sparks, Mr. Garner testified before the grand jury and at trial that he could not identify Elias and Jesse Sparks as his assailants. However, he acknowledged that he had grown up with Elias and Jesse Sparks and that they were "like family." At trial, Mr. Garner said that immediately before the assault, he was in the third floor attic room of his sister's house "getting high" on crack cocaine. He acknowledged that someone visited him in the attic, but said he "couldn't tell who it was." When asked by the prosecutor: "[W]ho was it that you thought came up to the attic to visit you," Mr. Garner replied: "Well, I thought it was Eli." He thought it was Elias Sparks because "[Sparks] thought [they] had a beef or something going on," and that Sparks wanted to speak with him about it. Mr. Garner was "supposed to have been telling rumors ... [a]bout Eli ... [a]nd [Jesse] Sparks." The person whom Mr. Garner saw in the attic stated that someone wanted to see Mr. Garner outside. Mr. Garner thought that he saw a gun on the person. Mr. Garner went outside because he did not want anything to happen in the house since his sister was there. Mr. Garner walked around the corner and "got hit" by "somebody standing with their [sic] back to [him]." When asked, "[W]ho is it that you thought turned around and swung at you," Mr. Garner stated: "I thought it was Jesse and Eli" and that Jesse "hit [him] in the eye." He tried to grab the person who hit him, but he was hit in the back of the head "a lot of times" with what he thought was a gun. Mr. Garner testified that he did not remember anyone saying anything to him while he was being hit. He did not "remember telling the police that the Sparks brothers said why are you putting rumors out on us as they were hitting [him]."

Mr. Garner thought he might have spoken to a female police officer when he was at the hospital after his assault, but he could not "really remember." To refresh his recollection, the prosecutor asked Mr. Garner to read portions of his grand jury testimony about his assault. The following exchange then occurred between the prosecutor and Mr. Garner:

Q. [D]oes that refresh your recollection that you, in fact, spoke with a female police officer on the night that you were assaulted?

A. Yes, I said I think so. I believe so.

Q. All right. What is it that that female police officer asked you?

A. I believe who ... did this to you?

Q. And what did you say in response to her question?

A. Well, at that time I thought it was them.

Q. Who?

A. Elias and Jesse.

Q. And what did you tell the police officer?

A. I believe I said it was them.

Q. You believe you told the police officer it was who?

A. Elias and Jesse.

When asked about the details that he gave to the female police officer on the night of his assault, such as whether Jesse Sparks had a pistol, the physical description of Elias and Jesse Sparks, and their cars, Mr. Garner generally stated that he did not remember. Nonetheless, when again asked by the prosecutor: "And at the hospital, you told the police that the persons who assaulted you were Jesse and Elias Sparks," Mr. Garner responded: "I believe I said that."

Although Mr. Garner generally denied telling Sergeant Neill about his assault, or said he could not remember whether he told Sergeant Neill who assaulted him, he thought he gave the sergeant "or someone" descriptions of where Jesse Sparks lived, and "the kind of gun each man had."

In addition to questions as to what he told Sergeant Neill, Mr. Garner was asked at trial about information he relayed to Detective Fulton. For example, the following exchange took place between the prosecutor and Mr. Garner:

Q. And did you also tell Detective Fulton that Elias Sparks hit you in the head with a gun?

A. I told him I believe somebody came behind me and was hitting me in the head from behind.

Q. And you told [him] that the person who was hitting you in the head from behind was Elias Sparks, didn't you?

A. Yeah, I thought it was him.

With respect to photos of Elias and Jesse Sparks shown to him by Detective Fulton and his identification of those photos, the record shows the following exchange between the prosecutor and Mr. Garner:

Q. What did you say when [Detective Fulton] showed you those pictures?

A. Well, he asked me who they were.

Q. What did you tell them?

A. I told him who they were.

Q. And what did you tell [him] about what they did to you?

A. Well, at the time I thought it was them and so I said it was them.

Q. That's what you told him?

A. Right.

Q. These are the people who assaulted me?

A. He asked me was that them and I said yes.

Several questions were posed to Mr. Garner by the prosecutor concerning his meetings with prosecutors and police officers approximately one month before trial. These questions were designed to show that as late as March 1997, or one month before trial, Mr. Garner maintained that

Elias and Jesse Sparks assaulted him. Following several questions to which less than precise answers were given, Mr. Garner was asked: "And in early March, you told the prosecutor and police officer[s] that Eli and Jesse Sparks were the ones who assaulted you?" Mr. Garner replied: "Sometime in March I did." Nonetheless, Mr. Garner acknowledged that during his first appearance before the grand jury on March 10, he refused to answer any questions. On his April 1st rescheduled appearance before the grand jury, Mr. Garner's lawyer told the court that he could not remember who assaulted him. Mr. Garner explained that he was high on cocaine the night of the incident and could not see who assaulted him.

At the conclusion of the government's evidence, Sparks made a motion for judgment of acquittal. In essence, he asserted that the identification evidence was insufficient as a matter of law. After viewing the evidence in the light most favorable to the government, the trial court denied the motion.

## ANALYSIS

■ Sparks presents two major arguments on appeal. First, he contends that the trial court erred in admitting Mr. Garner's prior identification statements as substantive evidence. Specifically, he claims that "Mr. Garner never testified that he perceived the person who attacked him," and that "[e]vidence of a prior identification is not properly admissible when the declarant is uncertain of, or recants, the prior identification at trial." Second he asserts that the trial court erred in permitting the government to introduce "highly prejudicial" impeachment testimony through law enforcement officers. The government argues that under D.C.Code § 14–102(b)(3),[2] the trial court properly

---

2. Section 14–102(b) provides:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (2) consistent with the declarant's testimony and is of-

admitted the identification testimony as substantive evidence; and that under § 14–102(a),[3] the trial court did not abuse its discretion in permitting the government to impeach Mr. Garner with his prior inconsistent statements.

■ "We review the trial court's legal conclusions *de novo.*" *Budoo v. United States,* 677 A.2d 51, 54 (D.C.1996). The issue regarding the meaning of § 14–102(b)(3) concerning an identification made after perceiving a person is a legal question which we review *de novo. See United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). However, "[i]t is the jury's province to resolve questions of credibility and to make reasonable inferences from the evidence." *Sterling v. United States,* 691 A.2d 126, 131–32 (D.C. 1997) (citing *Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988)). Furthermore, " '[t]he trial court is vested with broad discretion in determining the propriety of impeachment under ... § 14–102....' " *Id.* at 133 (quoting *Byers v. United States,* 649 A.2d 279, 283–84 (D.C.1994) (citations omitted)).

We turn first to the issue of whether the trial court properly admitted Mr. Garner's prior identification statements as substantive evidence. Section 14–102(b)(3) plainly states that a prior statement regarding an identification of a person made after perceiving the person constitutes substantive evidence. This provision is virtually identical to Fed.R.Evid. 801(d)(1)(C).[4] "The premise for Rule 801(d)(1)(C) was that,

given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications." *Owens, supra,* 484 U.S. at 562, 108 S.Ct. 838 (citing Advisory Committee's Notes on Rule 801, 28 U.S.C.App., p. 717). This is true because "[c]ontemporaneous identifications ... are considered reliable enough to justify their exclusion from the hearsay rule, ... even when the witness is unable to repeat the identification in the courtroom." *Samuels v. Mann,* 13 F.3d 522, 527 (2nd Cir.1993) (citing Fed.R.Evid. 801(d)(1)(C); *United States v. Lewis,* 565 F.2d 1248, 1252 (2nd Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978)).

Sparks asserts that "[e]vidence of a prior identification is not properly admissible when the declarant is uncertain of, or recants, the prior identification at trial." Current case law does not support this assertion.[5] Indeed, the court said in *United States v. O'Malley,* 796 F.2d 891 (7th Cir.1986): "Nothing in [Fed.R.Evid.] 801(d)(1)(C) prohibits the introduction of out-of-court statements identifying the defendant made by the declarant who at trial admitted that he made the prior identification but now denies that the defendant was the same involved in the crime." *Id.* at 899 (citing WEINSTEIN'S EVIDENCE, ¶ 801(d)(1)(C) [01] (1984); Graham, FEDERAL RULES OF EVIDENCE, § 801.12 (1984)); *see also United States v. Anglin,* 169 F.3d 154, 159 (2nd Cir.1999) (" 'A prior identification is admissible under Fed.R.Evid. 801(d)(1)(c), regardless of whether the wit-

fered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive, or (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

3. Section 14–102(a) specifies:
   The credibility of a witness may be attacked by any party, including the party calling the witness.

4. Fed.R.Evid. 801(d)(1)(C) specifies:
   (d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (C) one of identification of a person made after perceiving the person....

5. Sparks relies upon *Fletcher v. United States,* 524 A.2d 40 (D.C.1987), and *In re L.D.O.,* 400 A.2d 1055 (D.C.1979), both of which were decided before the Supreme Court's opinion in *Owens, supra.*

ness confirms the identification in court.' ") (quoting *United States v. Salameh,* 152 F.3d 88, 125 (2nd Cir.1998) (per curiam), *cert. denied sub nom., Abouhalima v. United States,* 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999)).

We conclude that the requirements of Rule 14–102(b)(3) were met in this case, and thus, Mr. Garner's prior identification statements were admissible as substantive evidence. First, Mr. Garner testified at trial and was subject to cross-examination regarding the statements, as the statute requires. Second, the plain words of the statute do not limit it to identifications made at a showup, lineup or photo identification, as Sparks argues. Third, even if Mr. Garner's trial testimony were to be regarded as a clear denial that Elias and Jesse Sparks assaulted him, the trial court followed the procedures set forth in *Mercer v. United States,* 724 A.2d 1176, 1196 (D.C.1999), since Mr. Garner was "afforded the opportunity to explain or deny [his prior identification] statement[s], and [the] opposing party ha[d] the opportunity to interrogate [him] concerning the statement[s]." *Id.*

With respect to the prior identification, Mr. Garner testified at trial that although he could not see who assaulted him, he nonetheless stated that he "believ[ed]" that he told Officer Rodriguez that Elias and Jesse Sparks assaulted him. He also acknowledged that when he met with Detective Fulton, he identified photos of Elias and Jesse Sparks as the persons who hit him with the guns because "at the time [Mr. Garner] thought it was them and so [he] said it was them." Even though Mr. Garner hedged his prior identifications at the time of his assault by using expressions like "I thought it was them" or "I believe I said it was them," the law enforcement officers who spoke with him at the hospital indicated that he was certain that Elias and Jesse Sparks were his assailants. Officer Rodriguez testified that Mr. Garner not only described the Sparks brothers, but also identified them by their names, addresses and the cars they drove. According to Sergeant Neill, Mr. Garner said "[Elias] and Jesse beat him with guns . . .," and that he "saw both of them strike [him] with guns."[6] From these statements, it is apparent that Mr. Garner, who had a lifelong relationship with Sparks and lived two doors away from the Sparks family as he was growing up, saw Elias and Jesse Sparks as they assaulted him. Thus, his "statement[s] of identification [were] made after perceiving [Elias and Jesse Sparks] and [were] admissible as such." *Mercer, supra,* 724 A.2d at 1195 (citing *Owens, supra* ); *see also Jones v. United States,* 719 A.2d 92, 93 (D.C.1998); *United States v. Brink,* 39 F.3d 419, 426 (3rd Cir.1994). Moreover, given the lifelong relationship between Sparks and Mr. Garner at the time of the incident, we agree with the trial court, contrary to Sparks' argument, that Mr. Garner's identification was trustworthy and reliable. *See Green v. United States,* 580 A.2d 1325, 1327 (D.C.1990).

6. After Mr. Garner had concluded his testimony, but before the law enforcement officers testified, the trial judge and counsel for the government and the defense discussed what the prosecutor properly could ask them regarding Mr. Garner's identification of his assailants. The trial judge stated: "Well, certainly [the prosecutor] can elicit the identification." Defense counsel agreed, saying, "That I think I'm stuck with. The statute is there." Later during the bench conference, the prosecutor observed that Mr. Garner "didn't remember telling Officer Neill the names of the men who assaulted him or telling them how they assaulted him. And he specifically did provide that information to Officer Neill." The trial judge responded: "I think you can make that inquiry of Sergeant Neill. . . . I think [you] can inquire of Sergeant Neill if he identified his assailant by name." Defense counsel stated: "Well, that's the statute. I don't think there's any question of that." Furthermore, defense counsel's basic objection to the admissibility of the prior identification testimony was that it "is so inherently weak or unreliable as to lack probative value." The trial court rejected this argument because Mr. Garner had a "substantial basis of knowledge" since he and Sparks were "lifelong childhood friends."

■ We turn now to the issue whether the trial court abused its discretion in allowing the government to introduce details regarding Mr. Garner's prior inconsistent identification statements, as impeachment evidence. Section 14–102(a) now provides: "The credibility of a witness may be attacked by any party, including the party calling the witness." Under the previous version of § 14–102, the rule with respect to impeachment with prior inconsistent statements provided, in pertinent part:

> When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the case.

*Sterling, supra,* 691 A.2d at 133 n. 6. The amendment to § 14–102, which took effect in May 1995, eliminated the requirements of "surprise" and a showing of "affirmative[ ] damage" to the party's case.[7] However, the amendment did not alter the principle that "[t]he trial court is vested with broad discretion in determining the propriety of impeachment under [ ] § 14–102...." *Id.* at 133. Based upon our review of the record before us, we are satisfied that the trial court did not abuse its discretion in allowing the government to introduce, through the testimony of law enforcement officers, details concerning certain of Mr. Garner's prior inconsistent statements. Indeed, the record shows that the trial judge was careful to limit the government's impeachment questions.[8]

■ Sparks' other arguments may be disposed of summarily. First, he contends that the trial court erred in admitting testimony about "a 'beef' involving [Sparks] as a reason why [Mr.] Garner thought [Sparks] was one of his assailants," because the testimony was "rank hearsay." We agree with the government that the statement about which Sparks complains was not "offered for the 'truth of the matter,' but rather to show what effect it had on the listener." Under *Patton v. United States,* 633 A.2d 800, 808 (D.C.1993), the trial court did not err by admitting the testimony. Second, Sparks maintains that "[t]he trial court erred in denying [his] motion for judgment of acquittal [because] the identification testimony was insufficient as a matter of law." Viewing the evidence in the light most favorable to the government, as we must, we agree that the identification evidence was sufficient to allow reasonable jurors to find Sparks guilty beyond a reasonable doubt. *See Patterson v. United States,* 479 A.2d 335, 338 (D.C. 1984).

■ Third, Sparks asserts that "[t]he trial court erred in permitting [Sparks' girlfriend] to testify [that she found] a pellet gun under [Sparks'] bed," because the testimony was irrelevant. We have held previously that: "[A]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of guilt, and is

---

7. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 10–628, THE "PUBLIC SAFETY AND LAW ENFORCEMENT SUPPORT AMENDMENT ACT OF 1994," October 26, 1998, at 2; *see also* Testimony of Robert Rigsby, then Deputy Corporation Counsel, and Eric H. Holder, Jr., then United States Attorney for the District of Columbia, on Bill 10–268, "Public Safety and Law Enforcement Support Act of 1994," before the Council of the District of Columbia, Committee on the Judiciary, July 6, 1994.

8. During trial, the judge specifically limited the government's impeachment questions:

> Here is what I will permit in the way of questions to the police officers. Whether or not he told them about the cars the assailants drove, whether he gave them a physical description of his assailants, whether he answered all of their questions. And I think that pretty well covers what he did not admit to saying to them at the time or didn't recall saying to them at the time.

When government counsel asked, "can I ask the police officers what did he tell you about what happened to him that night," the trial judge stated: "Of course not. That's hearsay."

therefore admissible." *Martin v. United States,* 606 A.2d 120, 132 (D.C.1991). Moreover, decisions as to the admissibility of evidence generally are left to the sound discretion of the trial judge. *See Powell v. United States,* 684 A.2d 373, 382 (D.C. 1996). We see no abuse of discretion. Fourth, Sparks argues that the trial court erred in not granting a mistrial when, in response to a question from the prosecutor, Sparks' girlfriend indicated that he was incarcerated. When the prosecutor asked, "Are you still involved in a relationship with [Sparks]," his girlfriend responded: "I mean, that all depends. I mean he's incarcerated and so I can't really answer that right now." Defense counsel refused the trial judge's offer to give a curative instruction. Under the applicable abuse of discretion standard, we see nothing to indicate that the trial judge abused her discretion in refusing to grant a mistrial. *See Wilson v. United States,* 691 A.2d 1157, 1160 (D.C.1997). The reference to incarceration was brief and inadvertent, and there is nothing to suggest, even remotely, that the prosecutor intentionally solicited a reference to Sparks' incarceration. *See Clark v. United States,* 639 A.2d 76, 79 (D.C.1993).[9] Finally, Sparks argues that "[t]he trial court erred in refusing to give the requested juror unanimity instruction," because of uncertainty as to whether Sparks was a principal or an aider and abettor. We disposed of this issue in *Tyler v. United States,* 495 A.2d 1180, 1182 (D.C.1985), concluding that, under these circumstances, a unanimity instruction was not required.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

9. In *Clark,* however, the prosecutor had warned the government witnesses not to refer to the defendant's previous contacts with the police and the criminal justice system. 639 A.2d at 80. The record is silent as to whether such warnings were given in this case. We emphasize that it is the prosecutor's responsibility to take all reasonable steps to assure that government witnesses not disclose inadmissible and potentially prejudicial evidence to the jury.