Terry D. BROADIE, Appellant

v.

UNITED STATES, Appellee.

No. 00–CF–906.

District of Columbia Court of Appeals.

Argued June 21, 2004.
Decided June 7, 2007.

---

Andrea Roth, Public Defender Service, with whom James Klein and Jaclyn Frank-furt, Public Defender Service, were on the brief, for appellant.

Mary B. McCord, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney when the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese, III, and Alan M. Boyd, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and TERRY, Senior Judge.*

TERRY, Senior Judge:

Appellant Broadie was charged in an indictment with one count of first-degree murder while armed and one count of carrying a dangerous weapon ("CDW"). After a jury trial, he was convicted of the lesser included offense of voluntary man-slaughter while armed ("VMWA"). The jury acquitted him of first-degree murder while armed, the lesser included offense of second-degree murder while armed, and CDW. On appeal he presents two claims of error. First, appellant contends, for three separate and independent reasons, that the trial court erred when it refused to instruct the jury on the lesser included offense of unarmed voluntary manslaughter. He also maintains that the trial court erred by giving the jury a "no duty to retreat" instruction because there was no evidentiary basis for it. We reject all of these arguments and sub-arguments and affirm the conviction.

I

A. *The Government's Evidence*

On the morning of July 27, 1998, nineteen-year-old Shanita Baylor and her friend Anika Cooper were drinking beer outside the home of Cooper's mother at 4006 Eighth Street, S.E. At the same time, Morkina Broadie, who is appellant's cousin, was visiting her grandmother in the same block of Eighth Street. After Baylor made a remark to Morkina's boy friend, Baylor and Morkina argued "off and on" throughout the afternoon. At one point, Morkina asked her friend Charvelle Fernandez to find help; Fernandez left and returned to the scene of the argument with appellant. Appellant discussed the situation with Cooper's boy friend, Donnie Barno, and everyone agreed to "squash" the argument. After appellant left, however, the argument did not end.

Later in the afternoon, as Morkina was about to get into Fernandez's car to drive home, Baylor approached Morkina and asked her if she wanted to fight. Cooper then displayed a small "kitchen knife,"[1]

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. Other than appellant, none of the witnesses who were present at this point saw Baylor with a knife.

and Morkina's sister, Marsha Broadie, retrieved a knife from her car.[2] Donnie Barno, with the assistance of a neighbor, broke up the argument and brought Baylor and Cooper back across the street to Cooper's mother's house before any fighting occurred. Morkina again told Fernandez to go for help, and she returned shortly thereafter with appellant.

When appellant arrived this time, Baylor, Cooper, and Barno were all standing near 4006 Eighth Street. Appellant walked over to them and asked who had a "problem" with Morkina.[3] Morkina and Fernandez also came across the street to where Baylor, Cooper, and Barno were standing.[4] While appellant was speaking to the group, Cooper pulled out a knife, and Baylor took out a can of mace.[5] According to Cooper's testimony, appellant told Baylor, "Go ahead and mace me.... I got something for you," adding that he was "going to put five of them up in her."[6] At that point Baylor sprayed the mace in appellant's face, but some of the mace also

landed on Morkina and on Cooper's mother. Baylor then turned around and ran away from appellant, toward the rear of the house where they had all been standing. Others who were present also began running, but they went in different directions. Appellant was the only one who chased after Baylor.[7]

Cooper's eleven-year-old brother, Benjamin Minkins, was the only witness who saw what happened next. From the corner of 4000 Eighth Street, Minkins saw appellant approach Baylor and "grab [ ] her by the arm and hit her in the chest."[8] Although he saw blood on Baylor's chest, he did not see anything in appellant's hand. Appellant then kicked Baylor in the head after she fell over some steps. Baylor, who had blood on both the front and back of her shirt, managed to stand up and run away, but eventually she collapsed in the middle of Eighth Street. As appellant left the scene, he passed fourteen-year-old Rodney Posey, who testified that he saw a knife in appellant's hand.[9] The police later

2. Jean Johnson, who lived at 4012 Eighth Street, called "911" to report the argument. She told the 911 operator that she saw "a bunch of girls out here with butcher knives fighting each other."

3. Vestal Cross, who lived at 4014 Eighth Street, was standing on her porch when appellant walked toward the group. She testified that "it looked like he had something in his hand.... The way he had his hand down, from what I could see, it did look like a knife."

4. Although Morkina testified that no one other than Charvelle Fernandez crossed the street with her, several witnesses testified that there were other young women who were present and crossed the street.

5. Morkina Broadie testified that, throughout the entire argument, she never saw Baylor with a knife.

6. Cooper also saw appellant pat "his hip" as he spoke. She explained that she "thought he probably had a gun," but she did not see one.

7. Barno and Cooper did not follow either Baylor or appellant, because Barno was holding Cooper back.

8. Detective Thurman Stallings later testified that when he interviewed Minkins, Minkins told him that Baylor did not have mace and that he was fifty feet or more from Baylor and appellant when he witnessed the stabbing. Detective Stallings also said that Minkins informed him that Baylor and appellant were in the middle of the street when Baylor was stabbed, which was contrary to Minkins' testimony.

9. Posey initially told the police that he did not see what happened. Detective Stallings testified that when he initially interviewed Posey, Posey said that he was not on the block at all that day.

recovered the can of mace that Baylor used, but they did not find a knife anywhere in the vicinity.

The court also admitted into evidence Baylor's autopsy report, which stated that Baylor died from two stab wounds. The government then called Deputy Chief Medical Examiner Dr. Jacqueline Lee, an expert in the field of forensic pathology, to explain the autopsy report and Baylor's wounds.[10] Dr. Lee stated that Baylor had a one-and-a-quarter-inch stab wound in the left side of her back (which we shall call the "back wound" or "first stabbing")[11] that was five to six inches deep. That wound passed through the muscles beneath the skin, between two ribs, through the left lung, and into the left chest cavity. The back wound ran from left to right at an upward angle. According to Dr. Lee, this wound was consistent with a person pulling Baylor by her left arm with one hand and inserting a knife with the other hand in an upward fashion toward the right. In addition, Dr. Lee said, "The irregularity in the wound noted by both the scrape and by the irregularity or tear at the wound indicate[d] that there was movement of the knife or movement of the body."

The other wound (the "chest wound" or "second stabbing"), on the right side of the chest, was five to six inches deep. It went through the breastbone, two major arteries at the top of the heart, and then into the left lung. Dr. Lee explained that it would take "a great deal of force for the knife to actually pass through bone," and that this wound was made in "a downward thrust passing from the right side to the left side and downward," consistent with someone raising the knife and coming down at the person being stabbed. Both wounds, the doctor said, were likely made by "a single edged knife," such as "a table knife or a steak knife."[12] She also stated that the autopsy reported listed the cause of death as "stab wounds to chest and back." However, when asked by the pros-

**10.** Dr. Lee was not present during the autopsy, which was performed by Dr. Vincent Hill. Because Dr. Hill was no longer working for the Medical Examiner's Office at the time of trial, the government called Dr. Lee to testify about the cause of Baylor's death. Dr. Lee made clear that her testimony was based on her own independent review of the autopsy report. She also explained that the reasons for Dr. Hill's departure from the office were not related to the present case:

> In terms of this particular case, this case has nothing to do with his being released. This case—I reviewed independently with independent findings as supported by the documentation and photographs, and the findings that are present in this report are documented independently, photographically, and I agree with the conclusions that he's come to in terms of this particular autopsy.

**11.** Dr. Lee described the stab wounds in the order in which they were "arbitrarily numbered" in the autopsy report, but emphasized that their numbering in no way indicated that either one came before the other. The wound discussed in this opinion as the back wound (or first stabbing) was originally numbered as the second wound in the autopsy report. The wound to which we refer as the chest wound (or second stabbing) was numbered as the first wound. In our summary of Dr. Lee's testimony, we have changed the order in which she discussed the wounds because appellant testified that the back wound occurred first and the chest wound occurred second. We do so only in an effort to analyze more clearly appellant's version of how the wounds occurred. As Dr. Lee herself stated, the wounds were arbitrarily numbered in the autopsy report, and there was no way in which the Medical Examiner's office could say conclusively which of the two was inflicted first. Moreover, the parties in their briefs generally refer to the back wound as the "first stabbing" and the chest wound as the "second stabbing."

**12.** According to Dr. Lee, a "single edged knife" has a cutting edge on one side and a dull edge on the other.

ecutor if either stab wound by itself could have caused Baylor's death, Dr. Lee answered, "Yes."

Finally, the government offered into evidence a letter that appellant wrote to Morkina Broadie on October 6, 1998, in which he asked whether her boy friend, Tony Monroe, would be a witness and "say ... that I didn't have a knife ... and that ... [Baylor] had a knife and mace and that she had been smoking and drinking." The defense sought to exclude this letter as prejudicial, but the trial court allowed it to be admitted. Appellant later testified that he wrote the letter to find witnesses, because he was worried that a letter that his grandmother had received from "some sniper guy" would scare away potential defense witnesses.

## B. *The Defense Evidence*

The first defense witness was Lucian Jackson, a security guard at Largo High School in Prince George's County, Maryland, who testified that security guards at Largo High had found a knife in Baylor's backpack when she was a student there in 1995.[13] Next, the defense called Dr. Nicholas Lappas, a professor of forensic science at George Washington University, who explained how alcohol affects the body. He also testified that Baylor's blood alcohol level of 0.17 showed that she was "significantly impaired as a result of alcohol and significantly intoxicated." Detective Monica Shields took the stand briefly and described the crime scene.

Appellant's aunt, Manica Broadie, testified that Baylor had a knife in her hand when she approached Morkina during the second part of the argument.[14] She said she tried to warn appellant about the knife in Baylor's hand when he arrived the second time, but she was unable to do so before Baylor sprayed the mace, which also hit her in her eyes and mouth. Although her eyes were watery from the mace, Manica stated that "ten seconds later" she saw appellant and Baylor run "in the same direction" behind the house; everyone else on the scene ran "in different directions." Although Manica did not see the encounter between appellant and Baylor after they ran behind the house, she testified that when they came back into view, appellant tripped over Baylor. At that point, she saw a knife "sitting on the side of [Baylor]," approximately "two or three inches" away. The next witness was Charvelle Fernandez, whose testimony was substantially the same as that given by Manica. She said she also tried to warn appellant that Baylor had a knife, but Baylor sprayed the mace before she could do so. Unlike Manica, however, Fernandez did not see appellant run after Baylor, or anything else that happened after Baylor sprayed the mace, because she ran to her own car.

Appellant then testified on his own behalf.[15] He said he was standing near Sixth and Brandywine Streets, S.E., when Fernandez first asked him to help Morkina. On that occasion appellant talked with Donnie Barno about how the argument

---

**13.** Appellant later testified that he was aware of the incident at Largo High.

**14.** On cross-examination, Manica Broadie admitted that she had a "very close" relationship with appellant, and that she did not immediately go to the police to tell them what she knew.

**15.** Before appellant took the stand, defense counsel called a defense investigator, Benjamin Goldsmith, to counter the testimony offered by Vestal Cross and Jean Johnson. Goldsmith said that those witnesses could not have seen appellant kick Baylor near the bus stop on Eighth Street, because the bus stop was not visible from either of their adjoining front porches.

was "petty," and then he left after the situation was "squashed." Approximately thirty minutes to an hour later, however, his cousin Marsha Broadie sought his aid a second time because Baylor and Morkina were still arguing. Appellant walked over to 4006 Eighth Street where Baylor, Cooper, and Barno were standing. He saw that Cooper was holding a knife, and that Baylor "had a can of mace in her left hand and a knife in her right hand." Just as appellant asked Barno, "What's up?", Baylor sprayed him in the face with mace. Although the mace went into his mouth and caused his eyes to water, appellant admitted that it did not affect his ability to see. He testified that he saw everyone running in different directions after Baylor sprayed the mace. He ran after Baylor, who he said still had a knife in her hand, because he believed that she was chasing Morkina.[16] He stated that Baylor "just had an altercation with [Morkina] earlier and she was trying to fight her. So I assumed that's who she was going after."

Appellant then described what happened when he caught up with Baylor:

> Well, as I ran to the opposite side of 4006, I had grabbed her by [her] left arm and turned her around. And as I turned her around, she was coming at me with her right hand like coming towards me with the knife.... I just reacted and with the knife—the hand that she had the knife in and swung at me, I reacted and jerked it up behind her back and grabbed her by the left shoulder.... By that time I struggled with her for a minute, for a few seconds, to get the knife out of her hand....

Next, he said, he "grabbed her by the right arm and like twisted—just pulled it—yanked her right arm up towards her back." Although he knew that Baylor's arm had hit her back, appellant stressed that he was not trying to stab her with the knife and did not know she had been stabbed. He said that the knife fell to the ground after he struggled with Baylor, and that he reached down to grab it. Just as he picked it up, he saw Baylor "reach in her purse for some shiny metal, and as she was coming at me, I stabbed her in the chest."[17] Appellant explained that he thought that Baylor was reaching for "a gun or maybe a knife" and that she was "try[ing] to kill me." According to appellant, all of this took place within "[a]bout five seconds at the most."

After appellant stabbed Baylor in the chest, he saw her run toward Eighth Street with a metal object in her hand, eventually falling down some stairs. He testified that he "thought she was going after [Morkina] again." Because he was "running so fast" after her and "couldn't stop," appellant "tripped over her," but he did not fall down. At this point, he said, "As I ran—I dropped [the knife] by my body and I ran" back to Brandywine Street.[18]

On cross-examination, the government questioned appellant about the conditions under which he pursued Baylor. First, with respect to Morkina's whereabouts, appellant admitted that he neither saw where Morkina was nor looked around or yelled out to warn her as he ran after Baylor; he "just thought" that she was in danger. Second, he acknowledged that Baylor ran away from him and not toward him after

---

16. Morkina Broadie, however, had testified earlier that she did not see Baylor holding a knife.

17. Neither the purse nor the shiny metal object was recovered by the police.

18. The police did not find a knife when they searched the area.

she sprayed the mace. Finally, he conceded that he did not "have fear for [his] life when [he] was chasing her," and that he could have stayed where he was on the street when Baylor ran away from him.

## C. *The Government's Rebuttal*

Dr. Lee, recalled by the government, testified that appellant's account of his struggle with Baylor was inconsistent with the wounds described in the autopsy report. First, concerning the back wound, Dr. Lee explained that grabbing Baylor's right wrist and twisting her arm to her back would have placed the wound on the left part of the back "in a direction towards the left and not towards the right." On cross-examination, Dr. Lee added, "It's not an impossible wound [for it to be toward the right], but it would be consistent with a degree of force ... so that the body is really being moved around and changed in position.... It's a terribly awkward position and would take a great deal of force to make the knife go in that direction...." Dr. Lee also agreed with defense counsel's suggestion that the back wound was consistent with "the person who's been stabbed and the person who's stabbing the person struggling to get the knife out." Additionally, Dr. Lee pointed out that because the knife went far enough into the back to reach the lung, it would not "automatically fall out on its own," as appellant had testified; rather, "it would have to be pulled out of the body." [19] As for the chest wound, Dr. Lee said that, unlike the back wound, there was "no irregularity to the wound on the skin of the chest," and she did not think "there was a movement of the knife or the person" when the chest wound was inflicted.

## II

### A. *The Defense Request for an "Unarmed" Instruction*

At the close of all the evidence, the trial court instructed the jury on the elements of first-degree murder while armed, second-degree murder while armed, VMWA, and CDW. Before the court gave those instructions, defense counsel requested that it also give an "unarmed" instruction to go with the homicide charges, arguing that "Mr. Broadie's testimony with regard to the [back] stab wound raises a question as to whether or not this was armed or unarmed." Counsel stated:

> In other words, since the knife was in her hand and not his, the jury could say, well, he shouldn't have done what he did. What he did was cause her death through his actions with some degree of, you know, a degree of malice or provocation if they want to look at it as [*sic*].
>
> But since she had the knife in her hand, he was not armed....
>
> So there could be a situation where what he's doing, although he doesn't have the same kind of homicidal intent he has for murder, he is not in possession—he is not armed under the definitions that are applicable, but still causes her death in some kind of reckless, provoked, or mitigated way.

The court responded, "I understand sort of the theoretical argument, but I think it's pretty clear, and I'm not inclined to give that [instruction]."

While deliberating, the jury sent the court a note asking for a definition of "readily available." Previously, the court had instructed the jury that in order to find appellant guilty of any offense "while armed," it had to conclude that "at the time of the offense the defendant was

---

**19.** Dr. Lee elaborated: "The blade, once it's within the body, the skin will close around it, the muscles will close around it, as would even the sections of the lungs."

armed with or had readily available a dangerous or deadly weapon, namely, a sharp object." [20] The court had also instructed the jury that it might "consider all of the circumstances surrounding [the weapon's] possession and use."

After learning of the jury's note, defense counsel asserted that the jury's question indicated the jurors could "believe Mr. Broadie's story that he inflicted that back wound by twisting her arm around and pushing it back into her back, [but could nevertheless be asking] is that some kind of armed offense or not? Is that weapon readily available to him or not?" Counsel then renewed his request for an unarmed instruction:

> So I would repeat our request, because I do think the evidence supports it, for unarmed instructions on all three of the homicide offenses.
>
> I think the evidence supports that possibility, particularly with regard to unarmed voluntary manslaughter, that in doing that . . . in fact, that he didn't have to twist her arm around like that, and so it could be conscious disregard of an extreme risk of death or serious bodily injury to twist the arm of somebody with a knife around the back.[21]

The court responded:

> But, you know, we don't know what they're thinking about. They could be thinking that . . . if he used a knife that she had . . . in any sense, if he grabbed her arm and that ends up with the wound, or that he . . . opportunistically or accidentally picked it up and whether that means armed with or not. They

may be thinking of armed with the way lots of people think you walk around with a knife . . . .

The court then asked both counsel to research the issue raised by the jury's note and said that it would make a decision the next day.

On the following day, the court discussed defense counsel's request for an unarmed instruction:

> Here, if the armed element is to be met, the government has to prove that he used it, not that he accidentally used it or that it accidentally, you know, sort of played into the offense in some way, but he has to have used it.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> . . . [I]f we only had the stab wound in the back, it is conceivable that the jury could, for example, say, we don't buy the defense of a third [person] . . . and, therefore, he has put himself in a position like this and he can't claim self-defense. But we think that when he— we believe his story about she had the knife and swung around towards him and we believe that when he grabbed her arm and twisted it behind her back, which we also believe he did in this theory, that he was acting in conscious disregard of an extreme risk of whatever it says.
>
> Now, I don't think that, if they believe that and that were the only stabbing, I think that would probably justify a vol-

---

**20.** This language appears to have been taken from the standard instruction found in the "red book." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.03(B) (4th ed. 1993) ("That, at the time of the offense, the defendant was armed with, or had readily available, a . . . deadly or dangerous weapon").

**21.** Defense counsel further maintained that while the jury could find appellant guilty of manslaughter for the back wound, it could believe that the chest wound was "legitimate self-defense."

untary manslaughter not while armed, because I don't think that's while armed.

\* \* \* \* \* \*

But I think there is no way, there is no evidentiary support for concluding that the second stab wound is accomplished not while armed. Even crediting fully the defendant's version of what happened, he used the knife to stick her. I mean, he did that deliberately in self-defense, according to him, but he did it deliberately. It's not accidental—it's not that the knife was in the way when he twisted her arm behind her.

So I don't see how on these facts there is either second-degree murder not while armed or voluntary manslaughter not while armed.

Defense counsel argued that there were two interpretations of the facts that would support giving the unarmed instruction. First, the jury could find, on the basis of Dr. Lee's testimony, that either wound could have killed Baylor, and that the back wound was fatal and the chest wound was not. Second, if the jury accepted appellant's version of how the wounds occurred, the back wound would constitute unarmed voluntary manslaughter, and the chest wound could be "viewed as not a crime at all [but] as reasonable self-defense at that point." To that the court replied:

> Wound number 1, if the jury believes that the knife just happened to be in her hand and he twists her arm behind her back and the knife is still in her hand, and he's not grabbing it and deliberately forcing that knife into her back, it just happens to be there when he twists her arm behind her back, I believe that is not voluntary manslaughter while armed.

The court also discussed the meaning of "readily available":

> [I]n the context of this case it does not mean, for example, that the weapon ... had to belong to the defendant, for example. It does not mean that the defendant had to have brought it to the scene. It does, however, mean—and this is to exclude the accidental twisting behind the arm, behind the back. . . . It does mean, however, that the weapon had to have been under the defendant's—in the defendant's physical control for at least a moment and that he then deliberately used it to commit the crime.

According to the court, appellant could not be found guilty of armed manslaughter if the use of the weapon was "accidental" and "if he twisted her arm behind his [*sic*] back and didn't mean to stab her."

■ Without objection from either party, the court responded to the jury's note by giving the following definition of "readily available":

> "Readily available" means that the weapon was within easy access of the defendant, and that he was in a position to exercise direct physical control over it. In the context of this case, it does not mean that the weapon had to belong to him, or that he had to have brought it to the scene. It does, however, mean that in order to find the defendant guilty of murder or manslaughter while armed with or while having readily available a dangerous weapon, you necessarily must conclude beyond a reasonable doubt that the weapon was under his physical control for at least a moment *and that he then knowingly and deliberately used it to commit the crime.* [Emphasis added.]

Although the court provided this definition of "readily available," [22] it never specifical-

---

**22.** The government states in its brief that "[a]lthough the government did not object to

this instruction at trial ... [the instruction was] an incorrect statement of the law, which

ly ruled on the defense's request for an unarmed instruction.

## B. *The Appropriateness of an "Unarmed" Instruction*

Appellant contends that there was a sufficient evidentiary basis for a jury instruction on unarmed voluntary manslaughter as a lesser included offense, and that the trial court therefore erred in refusing to give one.[23] His argument on this point is threefold. First, with regard to the back wound, appellant asserts that he did not intend to use the knife, and that for this reason the jury should have been given an unarmed instruction. Next, he maintains that "[t]he jury could have rationally found that the [chest wound] was in self-defense and, thus, could have looked solely to the [back wound] to find [him] guilty of unarmed voluntary manslaughter." Finally, appellant claims that "the fact that the jury acquitted [him] of the offense of carrying a deadly weapon" shows that the jury should have been given an unarmed instruction.

 This court has repeatedly said that "[a] defendant is entitled to a lesser included offense instruction when (1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge." *Rease v. United States*, 403 A.2d 322, 328 (D.C.1979) (citations omitted); *see also, e.g., Leak v. United States*, 757 A.2d 739, 740 (D.C.2000), *cert. denied*, 534 U.S.

1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001). Appellant's claim of error focuses only on the evidentiary requirement, *i.e.*, the second element under *Rease.*[24] Generally, "the court is not required to give a lesser-included offense instruction unless proof of the greater offense will require the jury to find a disputed fact that need not be found to prove the lesser charge." *Rease*, 403 A.2d at 328–329 (citations omitted); *see also, e.g., Lampkins v. United States*, 515 A.2d 428, 432 (D.C.1986). Stated another way, "[t]he requirement of a sufficient evidentiary basis can be met by a showing that (1) 'there is conflicting testimony on the factual issue,' or (2) the lesser-included offense is fairly inferable from the evidence, including a reconstruction of the events gained by accepting all or some of the testimony of some or all [of the] witnesses." *Boykins v. United States*, 702 A.2d 1242, 1250 (D.C.1997) (quoting *Robinson v. United States*, 388 A.2d 1210, 1213 (D.C.1978)); *see also, e.g., Leak*, 757 A.2d at 740. We have emphasized that "any evidence, however weak, will satisfy this requirement." *Rease*, 403 A.2d at 329 (internal quotation marks and citations omitted); *accord, e.g., Rouse v. United States*, 402 A.2d 1218, 1221 (D.C.1979) ("[t]he evidentiary requirement is minimal" (citation omitted)). "The lesser included instruction, however, is only required where ... 'a jury could rationally convict on the lesser included offense.'" *Leak*, 757 A.2d at 740 (quoting *Bright v. United States*, 698

---

inured to appellant's benefit." We agree that the instruction was incorrect because, in the portion we have italicized, it required the government to meet a higher burden than necessary. As our discussion in the text will explain, the government did not have to prove that appellant used the weapon "deliberately"; rather, to convict him of the armed offense, it was enough for the jury to find—as the trial court also instructed, and correctly— "that the weapon was under his physical control for at least a moment."

**23.** We note that appellant is not challenging the sufficiency of the evidence to support his conviction of voluntary manslaughter while armed.

**24.** Both parties agree that unarmed voluntary manslaughter is a lesser included offense of voluntary manslaughter while armed (VMWA).

A.2d 450, 457 (D.C.1997)). "[W]here a verdict on the lesser included offense would be irrational, or require the jury to undertake a 'bizarre reconstruction of the evidence,' the instruction is not warranted." *Boykins*, 702 A.2d at 1250 (citation omitted); *see also Bright*, 698 A.2d at 458 (lesser included offense instruction is not required when "the jury would have to disregard the government's evidence and engage in conjecture regarding why and how the [crime] occurred"). With these principles in mind, we turn to appellant's individual arguments.

### 1. *Intent*

Appellant contends, first, that the trial court should have given an unarmed instruction because his own testimony showed that he did not "knowingly and deliberately use Baylor's knife to commit a crime." [25] He asserts in his brief that "the jury could have reasonably concluded that, while [he] did commit voluntary manslaughter by acting in conscious disregard of an extreme risk to Baylor's safety by twisting her arm behind her back while she was carrying a knife, he did not deliberately use the knife to cause her death." Essentially, appellant is arguing that there was evidence that he did not have the intent required under the "while armed" statute, D.C.Code § 22–4502(a) (2001), [26] and that the trial court should

have therefore given the jury an unarmed instruction. Appellant bases his argument on the trial court's definition of "readily available," which informed the jury that it "necessarily must conclude beyond a reasonable doubt that the weapon was under his physical control for at least a moment and that he then *knowingly and deliberately used it* to commit the crime" (emphasis added). Appellant's argument fails because intent is not an element that needs to be proved under section 22–4502(a). [27]

Section 22–4502(a) is considered an enhancement provision and does not define a separate criminal offense. *See Hager v. United States*, 791 A.2d 911, 914–915 (D.C.2002); *Thomas v. United States*, 602 A.2d 647, 650–651 (D.C.1992). As an enhancement provision, it "does not require the *use* of or the *intent to use* a weapon in the commission of [a violent crime]; it requires mere availability of a weapon." *Washington v. United States*, 366 A.2d 457, 461 (D.C.1976) (emphasis in original). All that the government had to prove to meet the requirements of 22–4502(a) in this case was that "(1) the defendant committed a violent or dangerous crime, *and* (2) the weapon was (at least) readily available to him during the commission of that crime." *Jamison v. United States*, 670 A.2d 373, 375 (D.C.1996) (emphasis in original). [28] Any discussion of

---

**25.** "A defendant is entitled to rely upon testimony of some or all of the witnesses, in whole or in part, in an effort to meet the evidentiary requirement for an instruction." *Price v. United States*, 602 A.2d 641, 646 (D.C.1992) (citation omitted).

**26.** Formerly codified as D.C.Code 22–3202(a) (1996).

**27.** Section 22–4502(a) provides enhanced penalties for:

> Any person who commits a crime of violence or a dangerous crime in the District

of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon. . . .

**28.** In *Jamison*, which was an armed robbery case, we "publish[ed] [the] opinion only to dispel lingering confusion . . . about the meaning of the phrase 'while armed with or having readily available' in § [22–4502(a)]. . . ." 670 A.2d at 373–374. We explicitly rejected the appellant's argument that "the penalty enhancement permitted by § [22–4502(a)] required proof that he 'used the pellet gun in [some] manner to frighten or

intent would involve only the underlying criminal offense; whether or not the knife was "readily available" to appellant does not depend on his intent. Therefore, viewing the evidence in the light most favorable to appellant, as we must, *see, e.g., Minor v. United States,* 623 A.2d 1182, 1185 (D.C.1993), we hold that appellant's testimony that he did not intend to stab Baylor in the back did not entitle him to an unarmed instruction. To convict him of armed voluntary manslaughter, it was enough for the jury to find—as the trial court partially instructed it—"that the weapon was under his physical control for at least a moment." [29]

### 2. *Self–Defense*

■ Appellant's second argument in support of his claim that an unarmed instruction should have been given has two parts. First, he asserts that the jury could have viewed the infliction of the (second) chest wound as self-defense and, on the basis of Dr. Lee's testimony,[30] could also have found that it "did not cause Baylor's death, and ... accordingly disregarded it for purposes of determining the level of [his] culpability." Second, appellant proposes that "[o]nce the jury decided not to impose homicide liability for the

second stabbing, it could find [him] guilty of unarmed voluntary manslaughter based solely on the first stabbing." Initially, we regard this two-part argument as an attempt to draw attention away from appellant's testimony that he used the knife to stab Baylor in the chest, which clearly defeats any argument for an unarmed instruction in connection with the chest wound. As the trial court correctly observed, "even crediting fully the defendant's version of what happened, he used the knife to stick her [in the chest]."

■ The first part of the argument is unpersuasive because the jury, given appellant's testimonial admission that he stabbed Baylor in the chest, had only two options with regard to that chest wound: (1) to find that appellant acted in self-defense, and was therefore not criminally culpable for the chest wound, or (2) to find that appellant committed an armed offense. There was simply no rational way to view the evidence relating to the chest wound so as to enable the jury to find appellant guilty of an unarmed offense. On the other hand, there was sufficient evidence for the jury to find that appellant did not act in self-defense when he stabbed Baylor in the chest.[31] *See, e.g., Sparks v.*

---

threaten the [victim] with bodily injury....' " *Id.* at 374 (footnote omitted).

**29.** It also bears mentioning that appellant's own testimony established that the knife was readily available:

[A]s I turned her around, she was coming at me with her right hand like coming towards me with the knife.... I just reacted and with the knife—the hand that she had the knife in and swung at me, I reacted and jerked it up behind her back and grabbed her by the left shoulder.... By that time I struggled with her for a minute, for a few seconds, to get the knife out of her hand....

Thus, even though appellant was not gripping the knife with his own hand, the knife was still "readily available" to him during the first

stabbing. *See Guishard v. United States,* 669 A.2d 1306, 1314 (D.C.1995) (holding that "an operable pistol in a dresser drawer, just a few feet away from both appellants as they jointly engaged in a series of drug transactions, meets the definition of 'readily available' ").

**30.** After testifying that the autopsy report stated that the cause of death was "stab wounds," Dr. Lee said that either wound alone could have caused Shanita Baylor's death.

**31.** For example, although appellant testified that he stabbed Baylor in the chest with the knife because he thought she was reaching for a shiny metal object in her purse, neither the alleged shiny·metal object nor the purse was found by the police. In addition, several of

*United States,* 755 A.2d 394, 399 (D.C. 2000) ("it is the jury's province to resolve questions of credibility and to make reasonable inferences from the evidence" (citations omitted)). Furthermore, Dr. Lee initially testified that the autopsy report listed both wounds as the cause of death, and it was only after a follow-up question from the government that she said either wound alone could been fatal. As a result, the jury was presented with three options for the cause of death: (1) the back wound, (2) the chest wound, or (3) both wounds. We simply cannot say that the jury must or should have found that the back wound was the sole cause of death and that the chest wound did not contribute to Baylor's death, as appellant suggests. The evidence supported any combination of these three options, and there was simply no basis for the jury to ignore the strong likelihood that the chest wound was the fatal one.

Moreover, appellant's argument is flawed because it is based on the trial court's erroneous definition of "readily available." As we have observed, *supra* note 22, the trial court incorrectly added an intent element to the definition (while correctly pointing out that it required proof that appellant had control of the knife "for at least a moment"). Intent is not an element of availability, and D.C.Code § 22–4502(a) does not require proof of an intent to use a weapon in the commission of the underlying crime. *See Jamison,* 670 A.2d at 374; *Washington,* 366 A.2d at 461. Therefore, even if the jury believed that appellant acted in self-defense when he stabbed Baylor in the chest and that the back wound was the

sole cause of death, appellant's argument would still fail because his asserted lack of intent for the back wound does not negate the fact—established in part by his own testimony—that the knife was "readily available" to him when that wound was inflicted.

### 3. *The CDW Verdict*

■ Appellant's final argument on this point also has two parts. First, he contends that the jury's finding that he was not guilty of CDW shows that the court should have given an unarmed instruction. Second, he asserts that the jury rendered impermissibly inconsistent verdicts when it found him guilty of VMWA and acquitted him of CDW. Both arguments are unpersuasive.

■ The jury's decision to acquit appellant on the charge of CDW does not establish either that an unarmed instruction should have been given or that the verdicts were inconsistent. "As a sentencing enhancement provision, [section 22–4502] does not comprise a criminal offense in and of itself. Rather, its application is dependent upon a conviction of the underlying offense." *Thomas,* 602 A.2d at 650. CDW, on the other hand, is a criminal offense in and of itself, and it requires that the government prove that a defendant actually carried a weapon. *Reed v. United States,* 828 A.2d 159, 162 (D.C.2003) ("To obtain a conviction [of CDW] when the weapon in question is a knife, the government must prove beyond a reasonable doubt (1) that the defendant carried the knife either openly or concealed, (2) that the defendant had the general intent to do

---

the witnesses present that day, including Morkina Broadie, stated that they did not see Baylor with a knife; the only thing they saw in her hand was a can of mace. The jury could also have considered Dr. Lee's testimony that the wound was made in "a downward

thrust passing from the right side to the left side and downward," and that the wound was consistent with someone raising the knife and bringing his arm down toward the victim, as evidence that appellant did not act in self-defense.

the acts constituting the carrying of the knife, and (3) that the purpose of carrying the knife was its use as a dangerous weapon." (citation omitted)). In this case there was evidence that appellant did not carry the knife to the scene of the argument but that the knife was readily available during his struggle with Baylor. Thus the jury could rationally have concluded that although he did not meet the requirements for CDW, he did have the knife "readily available" in connection with the offense of VMWA.

### 4. Conclusion

On the record before us, we think that an unarmed instruction in this case would have been "irrational, or [would have] require[d] the jury to undertake a 'bizarre reconstruction of the evidence.'" *Leak,* 757 A.2d at 740 (citations omitted); *see Shuler v. United States,* 677 A.2d 1014, 1017 (D.C.1996) ("the court is 'not required to put the case to the jury on a basis that essentially indulges and even encourages speculations as to bizarre reconstruction'" (citation omitted)); *Price, supra* note 25, 602 A.2d at 644 (a lesser included offense instruction is not required if a "finding to the contrary on the only evidence at issue would be irrational" (citation omitted)); *Catlett v. United States,* 545 A.2d 1202, 1216 (D.C.1988) (lesser included instruction is not appropriate where "mental gymnastics are required" (citation omitted)), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989). The homicide charged in this case could not have been committed while unarmed, because the evidence conclusively established that the victim died of one or two stab wounds caused by a knife. There was no alternative evidence regarding the cause of death. *See Lampkins,* 515 A.2d at 432 (when "undisputed facts [are] capable of only one inference ... no lesser-charge instruction [would] be proper, let alone required" (citation omitted)). Therefore, if the jury did not believe appellant's claim of self-defense, the only rational conclusion that it could have reached was that appellant was guilty of an armed offense. A person cannot be stabbed unless the stabber has a weapon of some kind—a knife, dagger, stiletto, ice pick, or even an icicle. As a matter of logic (and physics), there can be no such thing as an unarmed stabbing.

### III

 Appellant's other claim of error is that the trial court erred in giving the jury a "no duty to retreat" instruction, because there was no evidentiary basis for it. When the trial court first mentioned that it was going to give the instruction, defense counsel objected, asserting that the evidence did not support it. The court disagreed and informed defense counsel that it was "going to give 5.15."[32] Defense counsel then submitted a modified version of instruction 5.15, which included language that took into account appellant's theory that he was acting in defense of a third person, Morkina Broadie. The modified instruction also stated that if the jury found that appellant failed to retreat, it

---

**32.** CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.15 (4th ed. 1993), reads as follows:

The law does not require a person to retreat or consider retreating when s/he actually and reasonably believes that s/he is in danger of death or serious bodily harm and that deadly force is necessary to repel that danger. But the law does say that a person should take reasonable steps, such as stepping back or walking away, to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety. In deciding whether the defendant acted reasonable, you should therefore consider whether the defendant could have taken those steps, consistent with his/her own safety.

was "one of the many circumstances" it could consider. The court included these changes in the instruction that it gave to the jury:

The law does not require a person to retreat or consider retreating, when he actually and reasonably believes that he or another person is in danger of death or serious bodily harm and that deadly force is necessary to repel that danger.

But the law does say that a person should take reasonable steps, such as stepping back or walking away, to avoid the necessity of taking human life, so long as those steps are consistent with the safety of himself and the safety of a person he is attempting to protect.

If the defendant could have retreated without compromising the safety of himself or any other person but did not do so, his failure to retreat is one of the many circumstances you can consider in determining whether the defendant went further in repelling the danger, whether real or apparent, than he was justified in doing in this situation.

As he did below, appellant claims that the evidence did not support the "no duty to retreat" instruction. He asserts that "the government presented absolutely no evidence that [he] had time to avoid using deadly force to repel Baylor's attacks while simultaneously protecting himself and Morkina Broadie, assuming, as [he] testified, that Morkina was at risk of serious bodily harm or death." We are not persuaded.

■■■ When the trial court gives a jury instruction that the defense has challenged, we review the instruction for abuse of discretion. *E.g., Johnson v. United States,* 840 A.2d 1277, 1279 (D.C.2004). The trial court has "broad discretion in fashioning appropriate jury instructions," *Crutchfield v. United States,* 779 A.2d 307, 333 (D.C.2001) (citations omitted), and we analyze "each case on its own facts and circumstances" in determining whether a jury instruction was appropriate. *Simons v. Federal Bar Bldg. Corp.,* 275 A.2d 545, 549 (D.C.1971). When there is a "truly relevant question" as to whether a defendant could have safely retreated, as there was in this case, the trial court may give the "no duty to retreat instruction." *Smith v. United States,* 686 A.2d 537, 545 (D.C.1996), *cert. denied,* 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997) (citing *Cooper v. United States,* 512 A.2d 1002, 1006 (D.C.1986)); *see also Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979) (noting that the "middle ground [in this jurisdiction] does permit the jury to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm"). Therefore, we agree with the government that "[a]ppellant's argument ignores the substantial evidence, including appellant's own testimony, raising the issue of whether appellant could have safely retreated." On cross-examination, appellant admitted that when he ran after Baylor, (1) he did not see where Morkina was, (2) he did not call out to warn her, and (3) he could have stayed where he was on the street when Baylor first ran from him.[33] This testimony provided a sufficient basis for giving the "no duty to retreat" instruction.

## IV

We hold that an unarmed instruction was not warranted in this case. Whether

---

33. Appellant also testified that although the mace went into his eyes, it did not affect his vision.

the knife was "readily available" did not depend on appellant's intent, and an unarmed instruction would have been irrational on the facts before the jury. We also hold that the trial court did not abuse its discretion when it gave the "no duty to retreat" instruction because appellant's own testimony provided the evidentiary foundation for that instruction. Appellant's conviction is therefore

*Affirmed.*