*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-2064

ERIC D. FOREMAN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-7920-10)

(Hon. Robert E. Morin, Trial Judge)

(Argued June 11, 2014                                    Decided April 30, 2015)

*Jonathan S. Zucker* for appellant.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Stephen Gripkey*, and *Adrienne Dedjinou*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*:  A jury convicted appellant, Eric D. Foreman, of first-

degree felony murder and other serious crimes committed in the Northwest quadrant

of the District of Columbia.[1]   He (1) contends that the trial court erred by admitting as substantive evidence, under D.C. Code § 14-102 (b)(3) (2012 Repl.), Bradley Jackson's identification of him; (2) claims that the trial court committed error in responding to a note from the jury; and (3) argues that some of his convictions must be vacated on merger grounds.   We discern no error in the trial court's admission of Mr. Jackson's identification of Mr. Foreman, and even assuming error, we conclude that it is highly probable that the assumed error did not contribute to the verdict. We also hold that the trial court did not abuse its discretion in responding to the jury's note.   Consequently, we affirm the trial court's judgment, but we remand the case with instructions to vacate either the felony murder conviction or the first-degree murder conviction and to resentence Mr. Foreman.

## FACTUAL SUMMARY

The government submitted evidence concerning the random murder of Neil

---

[1]   The jury also found Mr. Foreman guilty of first-degree murder while armed (premeditated), in violation of D.C. Code §§ 22-2101, -4502 (2012 Repl.); carrying a pistol without a license (CPWL), in violation of D.C. Code § 22-4504 (a) (2012 Repl.); possession of an unregistered firearm, in violation of D.C. Code § 7-2502.01 (2012 Repl.); possession of ammunition, in violation of D.C. Code § 7-2506.01 (3) (2012 Repl.); and three counts of possession of a firearm during a crime of violence (PFCV), in violation of D.C. Code § 22-4504 (b).

Godleski in Sherman Circle, around 12:35 a.m. on Sunday, August 22, 2010. Prior to the murder of Mr. Godleski, Jamal Bell, the best friend of Mr. Foreman, was killed on June 18, 2010. In addition, on August 21, 2010, Naaman Williams was shot in the leg with the same gun that caused Mr. Godleski's death.[2]

Government witnesses included several young people who hung out together in the Petworth section of Northwest Washington, which includes Sherman Circle. These witnesses described the relationships among themselves, shootings that took place before and after Mr. Godleski's murder, the alleged relationship between the killing of Jamal Bell and the shooting of Mr. Williams, and the shooting of Mr. Godleski. The mothers of two of the young people also testified, as well as MPD personnel involved in the investigation of Mr. Godleski's murder and the shooting of

---

[2] Government witness Jonathan Pope, a Metropolitan Police Department firearms examiner, testified that he examined cartridge cases recovered from the scene of Mr. Godleski's murder and a bullet taken from Mr. Godleski's body, and cartridge cases as well as "a caliber .38 lead bullet" from the scene of Naaman Williams's shooting. The cartridge cases were "caliber .380 auto cartridge cases," "Starline brand." Mr. Pope concluded that "they [the cartridge cases] were fired from the same firearm," and both the bullet removed from Mr. Godleski's body and the one recovered from Mr. Williams's shooting were "consistent . . . with having been fired from a .380 caliber semi-automatic."

Mr. Williams.[3]  The government witnesses generally were reluctant to testify at trial and claimed that they could not recall or remember, even though they had made prior statements to the police and grand jury about the incidents that occurred on August 21 and 22, 2010.

Alexus Thorne, a senior in high school and a friend of Mr. Foreman, testified that on August 21, 2010, she, her sister Dinekia Thorne, Shamel Goodine, and Reginelle Davis had been hanging out together in Sherman Circle, celebrating Shamel's birthday.   They were joined by some young men, including Mr. Foreman, Marquis ("Man-Man") Lee, Prince Okorie,[4] and Bradley Jackson.  She saw Mr. Williams, a former classmate, and spoke to him.  As the group was crossing Sherman Circle to go to the Clark Elementary School playground, Alexus looked back and saw "a huddle around [Naaman]."  "[T]hey" asked if he knew anything about "Mal" (Jamal) "getting shot."[5]  Alexus and her group proceeded towards

---

[3]  We discuss Bradley Jackson's testimony and that of his mother, Karin Jackson, in the analysis section of this opinion.

[4]  The parties stipulated at trial that Mr. Okorie was killed in the Petworth section of Washington on November 30, 2010.  The defense trial theory was that Mr. Okorie killed Mr. Godleski.

[5]  Before the grand jury, Alexus had identified Mr. Foreman as the person who posed the question about Jamal to Naaman, and she had stated that Mr.
(continued…)

Clark, but Prince was "running behind [Naaman] as if he was trying to catch up with him."

As the group approached Clark, it was getting dark. Mr. Foreman, Dinekia Thorne, Bradley, and Marquis were drinking. Alexus maintained that she is "not a drinker" and "just was there, but [she] didn't have any alcohol."[6] Prince "had changed his shirt" and maybe his jeans. "He seemed like he was out of breath, like he couldn't catch his breath, as if he was running." He ran over to Mr. Foreman and they argued. She heard Mr. Foreman ask Prince, "So did you do it?" Mr. Foreman repeatedly said, "Did you yeah." Prince replied, "He was running too fast. I

_____

(…continued)
Foreman was "yelling" and "Naaman was trying to find his way out of the circle." When Naaman left the group, Mr. Foreman told Prince, "Don't let him get away," that "he was going to remember their face," and "go get him."

[6] Alexus's sister, Dinekia Thorne, testified that Alexus "wasn't drinking a lot because she don't drink, but she was drinking." Before the grand jury Dinekia had stated that Alexus did not drink at all. Dinekia gave testimony about the events of August 21, 2010, including what happened at the Clark playground, as follows. At Sherman Circle, some of the young men in the group yelled at Naaman but Mr. Foreman told them to "keep walking," [j]ust keep going." When she looked back, she saw Prince "in Naaman's face." When Dinekia denied seeing Prince with a gun at Sherman Circle, she was impeached with an excerpt from her grand jury transcript; she testified that she saw something "silver" in Prince's hand and thought it was "[a] gun." Prince arrived at Clark later than the others; he was dressed in a different shirt. He got into an argument with Mr. Foreman. Mr. Foreman was angry and was yelling at Prince.

couldn't hit him. He was running to the car. I couldn't hit him." Mr. Foreman answered, "[m]an I should never gave it to you. He [is] going to remember our face." Mr. Foreman was furious. Alexus testified before the grand jury that the word "yeah" was a "filler" — a substitute for other words. "Yeah" meant, "[l]ike did you shoot him. Like did you hit or kill him. Stuff like that. Like did you get him."

Jeremy Bell, the twin brother of decedent Jamal Bell, claimed at trial that he did not remember events and had been "traumatized."[7] Consequently, the prosecutor questioned him in detail about his grand jury testimony on September 29, 2010, as he read excerpts from the transcript. The excerpts revealed that Jeremy had described the man on the bicycle to the grand jury. He had seen Mr. Foreman shoot the man. Mr. Foreman was "right next to the victim," and "he ben[t] down and picked up something." Jeremy had also testified that Bradley, J.B. and Man-Man (Marquis) were at the scene of the crime. Before he went into the grand jury, Jeremy had started to imply that he had not seen Mr. Foreman shoot the man on the bicycle. But he explained to the grand jury that he "felt [he] didn't want to be

---

[7] Jeremy pled guilty to two misdemeanors relating to his arrest for robbery, force and violence. The trial pertaining to his brother's murder took place in April or May 2012.

involved in much of the case."

Marquis Lee, a seventeen-year old high school drop-out who was incarcerated at the time of Mr. Foreman's trial due to an assault adjudication and revocation of probation, initially refused to participate in the trial. The trial court held him in civil contempt,[8] and the government granted him limited immunity relating to his trial testimony.

Mr. Lee acknowledged that he had given a written, signed statement to the police in September 2010 indicating that he was on the scene when Mr. Godleski was shot, and that Mr. Foreman shot him. He adopted his written statement when he appeared before the grand jury in October 2010. Before the grand jury he testified that he saw Mr. Foreman approach the man on the bicycle "with a gun out, pointed at the guy like he was robbing him." He "saw the gun flash and Eric shooting the man." He "heard about three shots, and the guy on the bike was going

---

[8] Later, counsel appointed to represent Mr. Lee informed the trial judge that Mr. Lee would assert his Fifth Amendment constitutional privilege because his grand jury testimony two years earlier was not true.

down."[9]  Mr. Lee "started walking away fast."  However, during his immunized trial testimony, Mr. Lee denied that he was present when Mr. Godleski was shot. Furthermore, he claimed that he was at home all night, that Mr. Foreman came to his house with [Mr. Lee's] mother around 9:00 or 10:00 p.m. and he remained there until the next morning.  But, Mr. Lee agreed that he was in Sherman Circle with Mr. Foreman earlier in the day when Naaman Williams walked through the area; Mr. Okorie and others also were there.[10]

Mr. Lee and Mr. Foreman proceeded to Clark Elementary and Mr. Okorie "turned around and walked off."  Mr. Okorie arrived at Clark about thirty minutes to an hour later.  He had changed his shirt.  He said he "was following Naaman" and he "tried to shoot him."  Mr. Foreman accused Mr. Okorie of being "dumb" and "stupid."  He asked why Mr. Okorie "would . . . do that in broad daylight," and stated, "if you was going to do that dumb stuff in the broad daylight, you should have

---

[9]  During his appearance before the grand jury, Mr. Lee asserted that the day after the shooting Mr. Foreman told him that he had shot the man on the bicycle after he had asked for his money and the man "wouldn't give it up."  Mr. Foreman "said he got $60.00."

[10]  After being granted limited immunity, Mr. Lee characterized Jamal Bell and Mr. Foreman as "close, like siblings, like close like brothers."  He asserted that Mr. Okorie had "[h]is gun, a black .380."  Mr. Foreman told Prince, "put it [the gun] up" and "Chill out."

finished what you was trying to do." Mr. Lee understood "you should have finished what you was trying to do" to mean, "[s]hoot him. Kill him."

After leaving Clark, Mr. Foreman, Mr. Lee, and Mr. Okorie went to Mr. Jackson's home in Petworth and sat on the porch; Mr. Lee's mother, Yvette Lee, was there during the day. When Mr. Jackson's mother asked them to leave because they were so loud, Mr. Lee and the others went to an abandoned house down the street. There, Mr. Foreman asked Mr. Okorie, "Where you put the gun at?" Mr. Okorie told him not to worry, he put it in "the cut" – meaning "a stash spot." Mr. Foreman called Prince "dumb" and Prince replied, "I don't care. They killed my man, so I don't care." Mr. Foreman and J.B. left, saying they were going to the corner store. They were gone for about thirty minutes. Prince did not leave with them.[11]

---

[11] At trial Mr. Lee maintained that by 6:00 or 7:00 p.m. on August 21, 2010, he arrived at his home. His mother returned to the home between 9:00 p.m. and 10:00 p.m. Mr. Foreman was with her and remained there during the night. Mr. Lee claimed at trial that when MPD detectives questioned him in 2010, he knew nothing about a murder in Sherman Circle and only learned that "a little shooting happened at the circle" when he transferred to a high school in Petworth. When the detectives kept asking him questions, he finally told them what they wanted to hear — that he was at Sherman Circle when Mr. Godleski was murdered and he saw Mr. Foreman shoot Mr. Godleski. However, Mr. Lee asserted that the first part of his statement to the detectives was accurate, including the events involving Naaman Williams, the conversation between Mr. Foreman and Mr. Okorie at Clark, and the conversation between Mr. Foreman and Mr. Okorie about the location of the gun.
(continued…)

Yvette Lee testified that she has a "close" personal relationship with Mr. Foreman, has known him for ten to twelve years, knows his family, and he calls her "Ma." Her son Marquis and one of her daughters are friends with Mr. Foreman. On August 21, 2010, she went to the home of her long-time friend, Karin Jackson, the mother of Bradley Jackson around 1:00 p.m. Marquis and one of Ms. Lee's daughters are also friends with Bradley. Ms. Lee remained at Ms. Jackson's home until around 1:00 a.m. She had been drinking and described her level of intoxication as "mellow." As she was preparing to leave Ms. Jackson's house, Mr. Foreman arrived. They began walking to Ms. Lee's home and at some point they were joined by Mr. Lee. When they reached Sherman Circle, Ms. Lee saw the yellow police tape and asked what happened. Mr. Foreman was "very intoxicated." Ms. Lee told the grand jury that as they were walking by, Mr. Foreman "grabbed" her hand and was "squeezing it." Mr. Foreman said, "Ma, I know who did that." "I did it." But he then said he was "just playing," and he was "laughing." At trial, Ms. Lee claimed that she "did not say that," although she agreed that the prosecutor read the grand jury transcript accurately.

---

(…continued)
The prosecutor reviewed Mr. Lee's testimony before the grand jury in detail and Mr. Lee acknowledged the accuracy of the grand jury transcript.

Reginelle Davis, a high school graduate, also lived in the Petworth area. She attended middle school with Mr. Foreman. Jamal Bell was her best friend and he and Mr. Foreman were like brothers, as were Jamal and Mr. Okorie.[12]

Sometime after she was at Sherman Circle on August 21, 2010, Ms. Davis was on the street when she heard "Nate" say to Mr. Foreman, "somebody told him that it was [Mr. Foreman] that shot the man." Mr. Foreman "walked off" but did not deny the accusation. Two or three days later, Ms. Davis saw Mr. Foreman "outside" and asked him, "what's going on [b]ecause people kept saying he did it," that is, he "[s]hot the man." Mr. Foreman "said he did," that is, he shot the man on the bicycle in Sherman Circle — the man on the bicycle that got killed. After Ms. Davis responded "no" to questions as to whether she had asked why Mr. Foreman

---

[12] While she was at Sherman Circle on August 21, 2010, Ms. Davis heard J.B. and Mr. Jackson tell Mr. Okorie to go after Naaman, but Mr. Foreman told him, "No." Mr. Okorie and Naaman were still at the Circle when Ms. Davis and others left to go to the liquor store. Ms. Davis had been drinking a lot that day. She was "buzzed," but she could remember "what was happening around her." She went to Clark playground with the group and drank more there. She did not see Mr. Lee but Mr. Jackson was there. When Mr. Okorie arrived at Clark, Mr. Foreman "called him stupid" and argued with him. Mr. Foreman was mad because he "had put the bullets in the gun" and Mr. Okorie had gone after Naaman "for nothing." Eventually Mr. Foreman and another person walked her to her home. She arrived around 10:30 p.m.

shot the man, and whether Mr. Foreman said anything about the gun, the prosecutor read excerpts from Ms. Davis's May 2011 grand jury testimony showing her responses as, "[h]e said he shot the guy because he was upset," and "[he] and Prince used the same gun."[13]

MPD Detective Hosam Nasr was the lead detective on the Godleski murder case. On August 23, 2010, Detective Nasr took Naaman Williams to the area near Sherman Circle where he had been shot. He found two shell casings, and a crime scene search officer recovered another shell casing close to the area.

Detective Nasr interviewed Mr. Lee in September 2010. Mr. Lee initially denied knowing about the shooting. As an investigative tactic the detective lied in telling Mr. Lee that there were cameras in the area of Mr. Godleski's shooting and that MPD had footage from the cameras that depicted the shooting. Detective Nasr asserted that he did not provide any details about the shooting. Mr. Lee identified Mr. Foreman as the shooter. Detective Nasr took Mr. Lee's statement and Mr. Lee signed it. Detective Nasr also interviewed Alexus Thorne and Jeremy Bell (in the

---

[13] Ms. Davis testified before the grand jury twice — in November 2010 and May 2011. She stated at trial that she testified untruthfully in November 2010 and acknowledged that she was scared of being labeled as a snitch.

presence of his mother) in September 2010.   Initially, Jeremy said he did not want to be a snitch and did not want it known that he had spoken with the police. Nevertheless, Jeremy identified Mr. Foreman as the person who shot Mr. Godleski.[14]

After the jury found him guilty, Mr. Foreman filed a motion for a new trial on the ground that "[t]he guilty verdicts in this case are contrary to the weight of the evidence."   In denying the motion, the trial judge observed that "[t]his was a difficult case for any fact finder to resolve because of the numbers of witnesses who were reluctant to testify."   Because witnesses claimed to not remember or recanted, the government had to present substantive evidence "through the use of prior inconsistent statements under oath."   Consequently, the jury had to assess the demeanor of witnesses to determine whether they testified truthfully.   The judge declared that "the demeanor in the case of some of the[] witnesses was . . . extraordinary" because they "refus[ed] to directly answer questions and g[a]v[e] in

---

[14]   On cross-examination of Detective Nasr, defense counsel sought to advance the theory of the defense that Mr. Okorie shot Mr. Godleski.   This theory was based in part on the later testimony of defense witness Emoka Njoku, who saw the color of the shirt the man who shot Mr. Godleski wore, and also on Alexus Thorne's description of the shirt Mr. Okorie changed into after he shot Naaman Williams.   Detectives had interrogated Mr. Okorie for six hours as a person of interest in both the Naaman Williams' shooting and that of Mr. Godleski.

some cases totally incredible answers to other questions." The judge declared that "[t]he jury deliberated hard and long about the case," and "[t]hey took their obligation seriously resolving the credibility decisions and finding [Mr. Foreman] guilty beyond a reasonable doubt." Therefore, the judge could not "say [that] the jury's decision was wrong or against the weight of the evidence."

## ANALYSIS

**The Admission of Bradley Jackson's Identification Statement as Substantive Evidence**

Mr. Foreman first contends that the trial court abused its discretion by admitting Bradley Jackson's statement, "Eric [Foreman] shot the guy," as substantive evidence under D.C. Code § 14-102 (b)(3), which provides in pertinent part:

> A statement is not hearsay if the declarant testifies at the trial . . . and is subject to cross examination concerning the statement and the statement is . . . (3) an identification of a person after perceiving the person.

***The Testimony of Bradley Jackson and Karin Jackson***

We set forth relevant parts of the testimony of Bradley Jackson and Karin Jackson regarding Mr. Jackson's alleged statement about Mr. Foreman's shooting of Mr. Godleski. Mr. Jackson testified at trial that he, Mr. Okorie, and Mr. Foreman went to school together. He denied being at Sherman Circle when Naaman Williams walked by, claimed he did not know who was at Sherman Circle on August 21 and 22, 2010, and denied talking with his mother about Mr. Godleski's shooting. After being reminded of his grand jury appearances on May 4 and 31, 2011, Mr. Jackson said he was at Sherman Circle "when a person on a bicycle came through." He heard gunshots and ran. He insisted that he did not remember those who were with him at the Circle, or any details. Yet, he claimed Mr. Foreman was not responsible for shooting Mr. Godleski because Mr. Foreman "is a good person." Mr. Jackson admitted that the police took him to the police station for questioning, but he denied talking to the police in September 2010 and giving them information about the Godleski shooting or about the presence of Naaman Williams at Sherman Circle. However, the prosecutor played excerpts from Mr. Jackson's videotaped interview with the police. In those excerpts Bradley identified the young people who were at Sherman Circle when Naaman walked by. Mr. Jackson also admitted being at Sherman Circle when Mr. Godleski came through on his bicycle, and he

indicated that he looked back when he heard gunshots. Mr. Foreman, Mr. Okorie and Jeremy Bell were behind him, but Mr. Jackson did not know who the shooter was.

The prosecutor used Karin Jackson's testimony to show that Mr. Jackson had made the statement, "Eric shot the guy." Ms. Jackson lived in the Petworth area until October 2010 when she was evicted from her home due to criminal activity involving drugs. Mr. Foreman's grandfather lived next to her and she also knew Mr. Foreman's mother. At trial she was asked what Mr. Jackson told her when he returned from his interview with MPD detectives in September 2010. She answered, "[h]e said that — Eric shot the guy." When the prosecutor inquired as to what Mr. Jackson had told her about his interview with the police, Ms. Jackson said she did not remember. The prosecutor referenced a question posed to Ms. Jackson during her March 31, 2011, appearance before the grand jury — "What was it that he [Mr. Jackson] told you?" She replied, "[h]e told me they were all together. Eric shot the boy, and everybody ran." The prosecutor again asked Ms. Jackson during her grand jury appearance what she remembered her son telling her after he returned from the police station. She answered, "[h]e said that they was up there at the circle, . . . [h]e, kids. There was a lot of them . . . . They were together. They were walking. They heard a shot. I guess they seen that it was Eric that shot him,

and they ran." Ms. Jackson agreed with the prosecutor that Mr. Jackson "said that it was Eric . . . who did it." Finally, the prosecutor read the following questions and answers from Ms. Jackson's grand jury testimony: "So you understood your son was relaying information that he personally knew himself, correct? Yes. Because he was in fact there and saw this happen? Right, yes. Did I read that correctly? Yes, yes."

On cross-examination, defense counsel emphasized Ms. Jackson's grand jury statement, "I guess they seen it was Eric." Ms. Jackson agreed with defense counsel that she "didn't really know whether [Mr. Jackson] was telling [her] stuff based on what he saw or heard." Defense counsel also elicited an admission from Ms. Jackson that at the time of the events in question, and for a "[v]ery long time," she "habitually" smoked PCP and marijuana, and also she was drinking and using cocaine (powder and crack), but "mainly PCP and cocaine." At the time of trial, she had been "clean" for five months.

### *The Standard of Review and Applicable Legal Principles*

Our analysis of the first issue is guided by the following standard of review and applicable legal principles. We review questions concerning the meaning of

D.C. Code § 14-102 (b)(3) *de novo*. *Sparks v. United States*, 755 A.2d 394, 399 (D.C. 2000) (citing *United States v. Owens*, 484 U.S. 554 (1988)). "Section 14-102 (b)(3) plainly states that a prior statement regarding an identification of a person made after perceiving the person constitutes substantive evidence." *Id*. "The prior identification exception to the hearsay rule allows the admission of out-of-court statements through the testimony of either the identifier or a third party who was present when the identification was made." *Brown v. United States*, 840 A.2d 82, 88 (D.C. 2004). "[H]earsay declarants must have personal knowledge of what they assert in order for their declarations to be admissible." *Ginyard v. United States*, 816 A.2d 21, 40 (D.C. 2003). "Absent evidence that the declarant based his remark on his 'own sensory perceptions,' the remark [is] inadmissible." *Id*. (citing *State v. Jones*, 532 A.2d 169, 173 (Md. 1987)).

"'It is the jury's province to resolve questions of credibility and to make reasonable inferences from the evidence.'" *Sparks*, *supra*, 755 A.2d at 399 (citation omitted). "[T]he underlying factual findings are reviewed under the 'clearly erroneous' standard . . . and the decision whether to admit or exclude the proffered statement, based on those factual findings, is reviewed for abuse of discretion." *Odemns v. United States*, 901 A.2d 770, 776 (D.C. 2006). Moreover, "[t]he preponderance of evidence standard . . . is traditionally used in deciding

preliminary fact questions." *Devonshire v. United States*, 691 A.2d 165, 169 (D.C. 1997); *United States v. Woodfolk*, 656 A.2d 1145, 1150 n.14 (D.C. 1995) ("[P]reponderance of the evidence is the most commonly accepted standard of proof for determining the admissibility of evidence.").

"To conclude that an error is harmless, we must find it *highly probable* that [that] error did not contribute to the verdict." *Odemns*, *supra*, 901 A.2d at 782 (alteration in original) (internal quotation marks omitted) (quoting *In re Ty. B.*, 878 A.2d 1255, 1267 (D.C. 2005)). "We must determine whether the error was *sufficiently insignificant* to give us *fair assurance* that the judgment was not substantially swayed by it. *Id*. (internal quotation marks omitted). "Thus, even where there is sufficient admissible evidence to support the judge's finding, we cannot treat the erroneous admission of hearsay as harmless unless the error was so inconsequential as to provide reasonable assurance that it made no appreciable difference to the outcome." *Id*. (internal quotation marks omitted).

### *Discussion*

On August 22, 2012, the day before the testimony of Bradley and Karin Jackson, the trial court revisited its earlier inclination to admit Bradley Jackson's

statement of identification through Karin Jackson. Defense counsel objected to Ms. Jackson's proposed testimony as to her son's alleged statement because of her statement during her grand jury testimony — "I guess they seen it was Eric that shot him, and they ran." Defense counsel argued that "[i]t was not clear whether . . . Bradley was telling her something he heard or something he saw," and that before the statement is admitted, "we need to clarify from Ms. Jackson whether . . . Bradley said he saw it or not." The trial court then examined Ms. Jackson's grand jury testimony in detail, focusing on Ms. Jackson's "Yeah" and "Yes" responses to the following questions from the prosecutor: "And so I understand, then[,] [Bradley] was saying that the police were correct in saying he was there?" "And had seen what had happened and knew what was going on?" "Is that correct?" When Ms. Jackson referred to "Eric," the prosecutor inquired, "What Eric was he referring to? Ms. Jackson replied, "Eric Foreman." The trial judge also focused on the following exchange between the prosecutor and Ms. Jackson: "So you understood your son was relaying information that he personally knew himself, correct?" Ms. Jackson said, "Yes." The prosecutor continued, "Because he was in fact, there and saw this happen? Ms. Jackson answered, "Right, yes." The trial court concluded, "I think that, to me, is a statement of identification, and there's evidence of personal knowledge."

On this record, we cannot say that the trial court's factual finding that Mr. Jackson was present and saw what happened to Mr. Godleski is "clearly erroneous." Nor can we say that the trial court was wrong in its interpretation of the requirements of D.C. Code § 14-102 (b)(3). The judge clearly recognized that "[e]xtrajudicial witness identifications are routinely used as substantive evidence of guilt," *Foxworth v. St. Amand*, 570 F.3d 414, 427 (1st Cir. 2009), under Fed. R. Evid. 801 (d)(1)(C), a rule that D.C. Code § 14-102 (b)(3) mirrors, *see Sparks*, *supra*, 755 A.2d at 399 & n.4; *see also Johnson v. United States*, 820 A.2d 551, 558 (D.C. 2003). The trial court here also knew that defense counsel sought on cross-examination to impeach Ms. Jackson's credibility, not only by invoking her "I guess" statement but also her involvement with drugs. However, the court also was aware that questions of credibility, reasonable inferences, and the weight of testimony are the province of the jury. *Sparks*, *supra*, 755 A.2d at 399 (citation and internal quotation marks omitted) ("[I]t is the jury's province to resolve questions of credibility and to make reasonable inferences from the evidence."); *see also Foxworth*, *supra*, 570 F.3d at 427 ("It is well-established . . . that determining a witness's credibility, even in the face of a furious attack, is a function that falls squarely within the province of the jury.").

Ms. Jackson's testimony constituted evidence that Bradley based his

identification of Mr. Foreman on his (Bradley's) own sensory perceptions, *Ginyard*, 816 A.2d at 40, because Ms. Jackson confirmed that Bradley "was relaying information [to her] that he personally knew himself," and "[b]ecause he was in fact there [at Sherman Circle] and saw this [Mr. Foreman shooting Mr. Godleski] happen." In short, we discern no error in the trial court's admission of Ms. Jackson's testimony and in its interpretation and application of D.C. Code § 14-102 (b)(3). *See Brown*, *supra*, 840 A. 2d at 88 ("The prior identification exception to the hearsay rule allows the admission of out-of-court statements through the testimony of either the identifier or a third party who was present when the identification was made."); *Sparks*, *supra,* 755 A.2d at 399 ("[A] prior statement regarding an identification of a person made after perceiving the person constitutes substantive evidence.").

Furthermore, even assuming the trial court committed error in admitting Ms. Jackson's statements regarding Bradley's identification of Mr. Foreman, we are satisfied on this record that the error would be harmless because "it is 'highly probable that [the] error did not contribute to the verdict.'" *Headspeth v. United States*, 86 A.3d 559, 567 (D.C. 2014) (alteration in original) (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 844 (D.C. 2006) (en banc)). Other witnesses placed Mr. Foreman at Sherman Circle at the time of Mr. Godleski's murder and identified

Mr. Foreman as the shooter. Even though some of these witnesses repeatedly claimed that they could not remember the events or evaded direct responses to questions, their sworn statements and grand jury testimony were properly admitted into evidence. *See McRoy v. United States*, 106 A.3d 1051, 1055 (D.C. 2015) ("[A] witness's prior statement is considered inconsistent with her[/his] testimony if she[/he] evades questions at trial by claiming a loss of memory."). The grand jury or trial testimony of other witnesses showed the following.

In his grand jury testimony, Jeremy Bell described the man he saw on a bicycle at Sherman Circle. He testified that he saw Mr. Foreman shoot the man, and Mr. Foreman was "right next to the victim." He also saw Mr. Jackson and Mr. Lee at Sherman Circle when Mr. Godleski was shot. Mr. Lee admitted at trial that he was at Sherman Circle on August 21, 2010, when Naaman Williams walked into Sherman Circle. He testified that Mr. Okorie had a gun and Mr. Foreman confronted him about trying to shoot Naaman "in broad daylight." Mr. Lee also testified at trial that he was with Mr. Foreman, Mr. Okorie and Mr. Jackson, at Mr. Jackson's house, when Mr. Foreman asked where Mr. Okorie put the gun. Although Mr. Lee claimed at trial that he and Mr. Foreman were at his (Mr. Lee's) home all night on August 21, 2010, he was impeached with his written and signed statement given to the police in September 2010, and with his grand jury testimony

that incorporated his written statement. He testified before the grand jury in October 2010 that he was at Sherman Circle when Mr. Foreman shot the man on the bicycle, that Mr. Foreman had "a gun out, pointed at the guy like he was robbing him," and Mr. Lee "saw the gun flash and [Mr. Foreman] shooting the man." Mr. Foreman also told Mr. Lee that he got $60 off of the man.

Ms. Davis declared at trial that sometime after the shooting of Mr. Godleski she was on the street when she heard "Nate" tell Mr. Foreman that someone told him that Mr. Foreman shot the man on the bicycle. Mr. Foreman did not deny the accusation. Two or three days later Ms. Davis asked Mr. Foreman what was going on because people said he shot the man on the bicycle. Mr. Foreman admitted shooting the man. According to Ms. Davis's grand jury testimony, Mr. Foreman "said he shot the guy because he was upset" and that "[he] and Prince used the same gun."

At the time of her trial testimony, Yvette Lee had known Mr. Foreman for ten to twelve years and had a "close" relationship with him. Sometime after 1:00 a.m. on the night of Mr. Godleski's murder, Ms. Lee and Mr. Foreman were walking from Ms. Jackson's home toward Ms. Lee's home. According to Ms. Lee's grand jury testimony, as they approached Sherman Circle and Ms. Lee saw the police tape,

Mr. Foreman grabbed and squeezed her hand, and he said, "Ma, I know who did that." "I did it." Mr. Foreman began to laugh and he said he was "just playing." Mr. Jackson admitted at trial that he was at Sherman Circle "when a person on a bicycle came through," and when he heard gunshots, he ran. However, Mr. Jackson's videotaped interview with the police revealed that when he heard the gunshots, he looked back and saw Mr. Foreman, Mr. Okorie and Jeremy Bell behind him.

Ballistics evidence, introduced through Jonathan Pope, a MPD firearms examiner, linked cartridge cases and bullets recovered in relation to both the Naaman Williams and the Godleski shootings and showed that the bullets were "consistent . . . with having been fired from a .380 caliber semi-automatic." Mr. Lee was with Mr. Foreman when Naaman Williams passed by Sherman Circle. Mr. Lee testified at trial that at that time, Mr. Okorie had "[h]is gun, a black .380." Later that same day, Mr. Foreman, Mr. Okorie and Mr. Lee were at an abandoned house down the street from Mr. Jackson's home when Mr. Foreman asked Mr. Okorie where he put the gun and Mr. Okorie replied, in "the cut."

Given this testimony, the weight of the prosecution's case against Mr. Foreman was substantial and compelling. Morerover, under the preponderance of

the evidence standard which governs the admissibility of evidence, *see Devonshire*, 691 A.2d at 169; *Woodfolk*, 656 A.2d at 1150 n.14, the evidence set forth above points to a reasonable and strong inference that Mr. Jackson saw Mr. Foreman shoot Mr. Godleski, and in light of its verdict, the jury obviously credited at least the testimony of Jeremy Bell and Mr. Lee, also eyewitnesses to the shooting and the actions of Mr. Foreman. Although there was evidence that some of the witnesses had been drinking or using drugs, the jury was responsible for determining their credibility, weighing their testimony, and making reasonable inferences based on that testimony. *See Sparks*, *supra*, 755 A.2d at 399; *see also Foxworth*, *supra*, 570 F.3d at 427. Consequently, we are convinced that it is "highly probable that [any] error [in admitting Bradley's identification through Ms. Jackson] did not contribute to the verdict." *Headspeth*, *supra*, 86 A.3d at 567.

**The Trial Court's Response to a Jury Note**

Mr. Foreman's second argument revolves around the trial court's response to a note from the jury during deliberations. He contends that "the court erred in failing to respond directly to the jurors' note by instructing that if they determined that a witness statement was based on a 'scenario' supplied by others and not on the witness' personal knowledge, it could give no weight to that statement." He

maintains that the error was not harmless.

### *The Note and the Response*

The jurors' note posed a question and voiced a concern:

> We have a question about statements from witnesses & interrogation of suspect/witnesses. Is it safe to assume that if the statements from witnesses are admissible in court then they were gathered in a legal and legitimate way[?]
> I.E. we are concerned with "feeding the witness scenarios."

The trial court engaged in a rather extensive discussion with counsel about the note and listened to their objections to proposed response language. Relatively early in the discussion, defense counsel asserted that the court's response to the second part of the note should be, "[i]f you believe a witness has been fed scenarios, information, whichever word, that should be a factor in your determining what weight to give the evidence or statement." As the discussion continued, defense counsel's main concern appeared to be avoiding a response to the "feeding the witness scenarios" language that would "discredit the inference he was asking [the

jurors] to draw" during his closing argument.[15]  Defense counsel focused on the trial court's proposed sentence that read, "[y]ou've heard evidence about how various statements were obtained and the circumstance under which they were made."  Defense counsel argued, in essence, that the unqualified use of the word "evidence" would negate or "discredit" an inference he wanted the jury to draw because "there would be no way [the defense] would have direct evidence of [communication between Mr. Okorie and others]."  Consequently, the court qualified "evidence by adding "direct or circumstantial."  The prosecutor said, "[t]hat's fine."  Defense counsel responded, "[y]eah," and asked, "[y]ou're going to put in 'direct and circumstantial?' The trial court answered, "I am going to do that," and defense counsel asserted, "[o]kay."

The trial court gave defense counsel and the prosecutor its final written

---

[15]  The court and counsel attempted to comprehend what the jury meant by "feeding the witness scenarios" — whether that was "an example" of their concern about whether statements "were gathered in a legal and legitimate way," or whether that was "an issue."  Counsel and the court thought that two things may have prompted the jury's focus on "feeding the witness scenarios" — Mr. Lee's testimony that he told the police what they wanted to hear, and defense counsel's closing argument that the jury could infer that others, including the detectives and Mr. Okorie's friends, suggested to Mr. Okorie that because his mother had blown his alibi by denying that he was with her at the time of Mr. Godleski's shooting, Mr. Okorie needed to deflect attention from himself by showing that he either gave his gun to someone else (Mr. Foreman) or told him where to find it.

version of its response before announcing it.[16]   The jury heard that version, which reads as follows:

> The statements of various witnesses are properly before you for your consideration during deliberations. The mere fact that they were admitted, however, does not tell you anything one way or the other about how they were gathered or their credibility.   You have heard evidence about how various statements were obtained and the circumstances under which they were made.  What weight, if any, you are to give such evidence, is solely your determination to make.
>
> In weighing the credibility of the statements, you may consider all evidence, direct or circumstantial, concerning the circumstances of making the statements.

### *Applicable Legal Principles and Discussion*

"Decisions regarding whether and how to reinstruct the jury are committed to the broad discretion of the trial court."  *Coreas v. United States*, 565 A.2d 594, 599 (D.C. 1989).  "[A]bsent abuse of that discretion we will not reverse."  *Gray v. United States*, 79 A.3d 326, 337 (D.C. 2013) (citation and internal quotation marks

---

[16]   Neither counsel articulated an immediate objection.  However, defense counsel soon said:   "Actually, for record purposes, I will object only to the [c]ourt not responding directly to the question of the last—what I would—what we've classified as the last half, 'We are concerned with feeding the witness scenarios.'"

omitted).   "[W]hen the jury explains specific difficulties, the trial court should clear them away with concrete accuracy."   *Id.* (citation and internal quotation marks omitted).   However, "[t]he trial judge must be especially alert not to send the jury back to resume deliberations having most recently heard supplemental instructions which are unbalanced."   *Yelverton v. United States*, 904 A.2d 383, 387-88 (D.C. 2006) (citation and internal quotation marks omitted).   "[W]hen the trial court gives supplemental jury instructions it should seek not only to respond to the jury's request as the court in its discretion sees fit, but it should do so in a manner that does not unduly emphasize one aspect of the case."   *Id.* (citing *Davis v. United States*, 510 A.2d 1051, 1053 (D.C. 1986) (per curiam) (internal quotation marks omitted).

On this record we are satisfied that the trial court did not abuse its broad discretion in responding to the jury's note.   *See Johnson v. United States*, 398 A.2d 354, 368-70 (D.C. 1979).   The trial court listened to the views of defense counsel and the prosecutor, and the court sought to draft a balanced response that would not unduly emphasize any particular aspect of the case.   The court understood that the gravamen of the jury's concern was whether the mere admission of direct or circumstantial evidence, including that relating to the detectives' interrogation of suspects and witnesses, as well as the closing arguments of counsel, meant that the evidence was legitimate, legal, and credible.   Consequently, the court instructed the

jurors that the mere admission "does not tell you anything one way or the other about how they were gathered or their credibility," that it was up to them to determine "[w]hat weight, if any," they would "give such evidence." Moreover, in answering the jury's concern about "feeding the witness scenarios," the court informed the jury, without specific reference to the detectives' interrogation of Mr. Lee, the interaction of the young witnesses, or defense counsel's assertions during closing argument, that as it weighed the issue of credibility, it could "consider all evidence, direct or circumstantial, concerning the circumstances of making the statements." Although the jury sent a note to the court the following day, indicating that it was "so divided on the fundamental evidence that reaching unanimity seems impossible," it did not express further confusion concerning "feeding the witness scenarios."[17] In short, we discern no abuse of discretion in the trial court's response to the jury's first note. *See Gray*, *supra*, 79 A.3d at 337; *Yelverton*, 904 A.2d at 387-88; *Coreas*, *supra*, 565 A.2d at 599; *Johnson*, *supra*, 398 A.2d 354.

---

[17] The trial court instructed the jury, in part, "[i]n light of the evidence presented, it may take some time to reach a resolution of this matter. As a result, I'm going to ask that you deliberate further in this case and that you keep an open mind about the case with a view to listening to others and expressing your own point of view to see whether you can reach unanimous decision."

**Merger of Convictions**

We summarily dispose of Mr. Foreman's contention that some of his convictions merge. The government agrees that he may not be convicted of both first-degree felony murder and first-degree premeditated murder of Mr. Godleski. *See Thacker v. United States*, 599 A.2d 52, 63 (D.C. 1991) ("When there is only one killing, the defendant may not be convicted of more than one murder."). In addition, the two PFCV convictions relating to each murder conviction also merge. *See Lester v. United States*, 25 A.3d 867, 872 (D.C. 2011) (quoting *Morris v. United States*, 622 A.2d 1116, 1130 (D.C. 1993)) ("[W]here two of appellant's convictions 'merge to become one crime of violence . . ., there can be only one associated offense of [PFCV].'"). Accordingly, we remand the case to the trial court with instructions to vacate either the felony murder or the first-degree murder conviction, and to vacate one of the associated PFCV convictions.

Mr. Foreman concedes that the predicate convictions of attempted robbery and premeditated murder do not merge because "each requires proof of a factual element that the other does not." Nevertheless, he contends that the associated PFCV convictions do merge because "they arise from a single possession of a weapon during a single violent act." The government argues that the associated

PFCV convictions do not merge under the "fresh impulse" or "fork-in-the-road" test, and that "after attempting to rob [Mr.] Godleski, [Mr. Foreman] faced a clear fork in the road before making the decision to shoot [Mr.] Godleski at close-range." Jeremy Bell testified before the grand jury that he saw Mr. Godleski ride past on a bicycle, and heard gunshots. He looked and saw Mr. Foreman firing gunshots at Mr. Godleski. Mr. Godleski fell but then got up and picked up his bicycle. Mr. Foreman "turn[ed] around and looked at the victim, and jogged back towards him." Mr. Foreman was "over there conversating with [Mr. Godleski]." Jeremy witnessed Mr. Foreman "bend down and pick[] up something," while Mr. Godleski was standing, and he "heard a single shot go off again." This evidence demonstrated that Mr. Foreman's attempted robbery of Mr. Godleski and his murder of Mr. Godleski resulted from separate impulses, and that he had reached a fork-in-the-road before killing Mr. Godleski. *See Gardner v. United States*, 698 A.2d 990, 1002 (D.C. 1997) (internal citation and quotation marks omitted). ("[W]hen there is an appreciable period of time between the acts on which two criminal convictions are based, there is no merger, even if the interval is quite brief.") In sum, we agree with the government that the PFCV convictions associated with the attempted robbery and murder convictions do not merge.

Accordingly, for the foregoing reasons, we generally affirm the trial court's

judgment but we remand the case to the trial court with instructions to vacate either the felony murder or first-degree murder conviction, and to resentence Mr. Foreman.

*So ordered.*